**UNITED STATES DISTRICT COURT OF**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIREMAN'S RETIREMENT SYSTEM OF ST. LOUIS and ESTHER KOGUS, Derivatively on Behalf of CITIGROUP INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL L. CORBAT, MICHAEL E. O'NEILL, JUDITH RODIN, ANTHONY M. SANTOMERO, WILLIAM S. THOMPSON, JR., DIANA L. TAYLOR, ERNESTO ZEDILLO PONCE DE LEON, FRANZ B. HUMER, JOAN E. SPERO, GARY M. REINER, JAMES S. TURLEY, DUNCAN P. HENNES, EUGENE M. MCQUADE, ROBERT L. RYAN, LAWRENCE R. RICCIARDI, ROBERT L. JOSS, VIKRAM S. PANDIT, JOHN P. DAVIDSON III, BRADFORD HU, ERNESTO TORRES CANTU, MANUEL MEDINA-MORA, KEVIN L. THURM, BRIAN LEACH, and JAVIER ARRIGUNAGA, <br><br> Defendants, <br><br> -and- <br><br> CITIGROUP INC., a Delaware corporation, <br><br> Nominal Defendant. | X <br> : Case No. <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> X DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF**
**FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT,**
**AND VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT**

## TABLE OF CONTENTS

Page(s)

I.     NATURE AND SUMMARY OF THE ACTION ............................................................... 1

II.    JURISDICTION AND VENUE ................................................................................ 5

III.   THE PARTIES ...................................................................................................... 6

       A.     Plaintiffs ..................................................................................................... 6

       B.     Nominal Defendant .................................................................................... 7

       C.     Defendants .................................................................................................. 7

IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS ........................................... 23

       A.     Fiduciary Duties ...................................................................................... 23

       B.     Breaches of Duties ................................................................................... 24

       C.     Code of Conduct and Code of Ethics ...................................................... 25

       D.     Additional Duties of the Audit Committee Defendants .......................... 25

       E.     Additional Duties of the Risk Management Committee Defendants ....... 27

       F.     Additional Duties of the Nomination, Governance and Public Affairs
              Committee Defendants ............................................................................. 28

       G.     Additional Duties of the Ethics and Culture Committee Defendants ...... 29

V.     THE INDIVIDUAL DEFENDANTS KNOWINGLY FAIL TO IMPLEMENT
       NECESSARY CONTROLS AT BANAMEX AND BUSA ............................... 29

       A.     Applicable Law ........................................................................................ 30

       B.     The Individual Defendants Knew of the Control Deficiencies at Banamex
              and BUSA that Resulted in BSA/AML Violations .................................. 35

              1.     Citigroup's Long History of Money Laundering ......................... 38

              2.     Citigroup Acquires Banamex Amid Widespread Reports of Drug
                     Money Laundering, Banamex Quickly Becomes Citigroup's Most
                     Important Business Unit ............................................................... 39

              3.     Citigroup Continually Violates BSA/AML Requirements .......... 40

4. ███████████████████████████ ███████████████████████ ..............44

5. ████████████████████ █████████████ ..........................50

6. █████████████████████ ████████ ..............................55

7. ██████████████████████ ████████ ............................57

8. █████████████████████ ██████████████████████ ..........59

9. █████████████████████ █████████████████████ ████████████ ..........69

 C. Frauds Exploit Individual Defendants' Failure to Ensure Effective Risk Management, Financial Reporting, and Legal Compliance Controls at Banamex Despite Ample Warning ..................................................79

  1. Increased Fraud Trend Alerts Board to Ineffective Controls at Banamex ......................................................................79

  2. $400 Million OSA Fraud Exploits Banamex's Inadequate Controls ........84

  3. The OSA Fraud Implicates Additional Control Failures at Banamex .......87

VI. THE DIRECTOR DEFENDANTS CAMPAIGN FOR RETENTION WHILE WITHHOLDING MATERIAL INFORMATION FROM STOCKHOLDERS. ..............90

VII. DAMAGES TO CITIGROUP ........................................................104

VIII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................................105

 A. Demand Is Excused Because Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Spero, Turley, Hennes, and McQuade Face a Substantial Likelihood of Liability for Breach of Fiduciary Duty ..................................................................106

 B. Demand Is Futile Because a Majority of Citigroup's Board Faces a Substantial Likelihood of Liability for Violating Section 14(a) of the Exchange Act ...................................................................114

IX. COUNTS..............................................................................115

A.     COUNT I – Against Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes for Violation of Section 14(a) of the Exchange Act............115

B.     COUNT II – Against the Individual Defendants for Breach of Fiduciary Duty...................................................................................................116

C.     COUNT III – Against the Individual Defendants for Waste of Corporate Assets ............................................................................................118

D.     COUNT IV – Against the Individual Defendants for Unjust Enrichment...........118

X.     PRAYER FOR RELIEF ................................................................................119

XI.    DEMAND FOR JURY TRIAL ....................................................................121

Plaintiffs, by their attorneys, submit this verified stockholder derivative action complaint against the defendants named herein.

Plaintiffs allege the following in light of Citigroup Inc.'s ("Citigroup" or the "Company") internal books and records received pursuant to an inspection demand made by plaintiff Esther Kogus on March 22, 2014 (the "Demand"), the investigation performed by Plaintiffs' counsel, and on information and belief, except as to the allegations specifically pertaining to plaintiffs which are based on personal knowledge.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Citigroup against certain of its officers and directors.  This action seeks to remedy defendants' violations of law, including anti-money laundering law and regulation ("AML"), breaches of fiduciary duty, corporate waste, unjust enrichment, and securities violations that have caused substantial damages to the Company.

2.    Citigroup is a global diversified financial services holding company that provides a range of financial products and services to consumers, corporations, governments, and institutions.  It operates in 160 countries and jurisdictions globally.  Citigroup's size and global operations amplify its need for effective internal controls over financial reporting, risk management, and legal and regulatory compliance.

3.    The Company's Mexican operations are particularly important to it.  Citigroup operates in Mexico through Banamex Nacional de Mexico ("Banamex") and Banamex's affiliate Banamex USA ("BUSA").  Citigroup's Mexican operations have accounted for more than 10% of Citigroup's revenue in recent years, and Banamex has about 1,500 branches—nearly double the number of Citigroup branches in the United States.

4.     Mexico is a well-known, high-risk country for corrupt practices and money laundering.   Deficient controls are likely to lead to fraud and other legal violations. Consequently, it is especially important that Citigroup implement and maintain adequate internal controls over its operation in Mexico, as the Individual Defendants (as defined herein) are well aware.

5.     Further, having appropriate internal controls is not just good governance, it is legally required.  Under applicable AML, including the Bank Secrecy Act (the "BSA") (together with AML, the "BSA/AML"), Citigroup must effectuate a BSA/AML compliance program commensurate to its BSA/AML risk profile.  At minimum, the program must ensure compliance with the BSA/AML, designate responsibility for compliance, provide compliance training, include transaction monitoring and suspicious activity reporting, and provide for independent testing of program efficacy, among other requirements.

6.     The Individual Defendants have nonetheless failed to implement anything resembling a true system of internal controls over Citigroup's operations in Mexico.   Internal documents the Company provided to plaintiff Esther Kogus in response to her Demand revealed that, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

7.     The Individual Defendants are (and were) acutely aware of Citigroup's deficient controls over Banamex and BUSA, particularly those necessary to prevent violations of the BSA/AML.  Alerts about Citigroup's deficient BSA/AML controls relating to Mexico date back to the turn of the century, when there were wide reports that the Company allowed drug dealers to

funnel money through its banks. ███████████████████████████

██████ ███████████████████████████████████████████

███████████████████████████████████████████████████ ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

8.      The deficiencies persisted and, in April 2012, the OCC issued a second consent order to Citigroup as a result of ongoing potential BSA/AML violations at Citibank N.A. ("Citibank") (the "OCC Consent Order").   In August 2012, the Federal Deposit Insurance Corporation/California Department of Business Oversight ("FDIC/CDBO") issued a consent order requiring remediation of BSA/AML violations and program deficiencies, specifically pointing out the lack of controls at BUSA, a subsidiary of Citigroup and close affiliate of Banamex (the "FDIC/CDBO Consent Order").   BSA/AML control deficiencies and potential violations of law still persisted.   In March 2013, Citigroup received a consent order from the Federal Reserve Bank ("FRB") extending the requirements of the OCC Consent Order to all of Citigroup and explicitly holding Citigroup Board of Directors (the "Board") responsible for ensuring Citigroup implemented the necessary controls and remedied violations of the BSA/AML (the "FRB Consent Order").[1] ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████

---

[1] The 2010 Consent Order, OCC Consent Order, FDIC/CDBO Consent Order, and FRB Consent Order are collectively referred to herein as the "Consent Orders."

9. 

10.     The Company's troubles with BSA/AML compliance are now coming to a head. After years of warning Citigroup about its deficient BSA/AML controls at BUSA and urging the Company to take action to bring BUSA's BSA/AML program into compliance, in early 2015, the FDIC/CDBO determined that BUSA "failed to implement an effective BSA/AML Compliance Program over an extended period of time" and fined the Company $140 million.  Even more recently, the U.S. Department of Justice's (the "DOJ") investigation of BSA/AML violations at BUSA implicated Banamex for its involvement in illegal cross-border transactions.

---

[2] Citigroup formed the Compliance Committee as part of its agreement with the OCC.  Though originally referred to as the Citibank Compliance Committee, the Compliance Committee's membership always included three Citigroup Board members and the Citibank Chief Executive Officer ("CEO"), and addressed Company-wide compliance matters for Citigroup.  Therefore, the Compliance Committee is (and has been) effectively a committee of the Citigroup Board.  However, Citigroup fails to appropriately treat the Compliance Committee as a true Board committee.  For example, there is no Compliance Committee Charter as is required for Board committees.

11.   ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████ ███ ████████████████

not only were Banamex's BSA/AML controls deficient, but its controls over risk management,

financial reporting, and compliance with other applicable law were also ineffective.  For example,

Banamex's deficient risk management, financial reporting, and legal compliance (including

BSA/AML) controls at Banamex permitted a $400 million fraud to continue until 2014, █████████

████████████████████████████

12.   The Individual Defendants' failures to implement sufficient internal controls at

Banamex and BUSA have severely damaged Citigroup.  Citigroup has already spent and will

continue to spend significant sums of money in connection with external and internal

investigations.  Worse, the FDIC/CDBO already fined the Company $140 million for its

BSA/AML violations at BUSA, and with regulators presently investigating Banamex, more

substantial fines are likely forthcoming.  In addition, Citigroup has suffered hundreds of millions

of dollars in fraud loss and millions of dollars in fines due to defendants' failures.

## II.   JURISDICTION AND VENUE

13.   Jurisdiction is conferred on this Court by Article III of the United States

Constitution and 28 U.S.C. §1331 because this action includes claims arising under Section 14(a)

of the Exchange Act of 1934 (the "Exchange Act").  This Court has supplemental jurisdiction

over all other claims in this action pursuant to 28 U.S.C. §1367(a).  The other claims in this action

are so related to the section 14(a) claims that fall within this Court's original jurisdiction that they

---

█ █████████████████████████████████████████████.

form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Citigroup maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III.   **THE PARTIES**

    A.   **Plaintiffs**

16.     Plaintiff Fireman's Retirement System of St. Louis was a stockholder of Citigroup at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Citigroup stockholder.

17.     Plaintiff Esther Kogus was a stockholder of Citigroup at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Citigroup stockholder.

B.    **Nominal Defendant**

18.    Nominal defendant Citigroup is a Delaware corporation with principal executive offices located at 399 Park Avenue, New York, New York.  Citigroup is a global diversified financial services holding company that provides a range of financial products and services to consumers, corporations, governments, and institutions.  The Company's business is currently divided into two primary segments: Citicorp, which consists of Citigroup's Global Consumer Banking businesses and Institutional Clients Group; and Citi Holdings, which consists of Brokerage and Asset Management, Local Consumer Lending, and Special Asset Pool.  Citigroup has approximately 200 million customer accounts and does business in more than 160 countries and jurisdictions.  As of December 31, 2014, Citigroup had approximately 241,000 full-time employees.

C.    **Defendants**

19.    Defendant Michael L. Corbat ("Corbat") is Citigroup's CEO and a director and has been since October 2012.  Defendant Corbat was also Citigroup's CEO Europe, Middle East and Africa from December 2011 to October 2012; CEO, Citi Holdings from January 2009 to December 2011; CEO, Citi's Global Wealth Management from September 2008 to January 2009; and served in various other positions with the Company beginning in 1983.  Defendant Corbat knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Corbat purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA,

-7-

including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Corbat also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant Corbat the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2014 | $1,500,000 | $4,600,000 | $7,727,757 | $606,924 | $6,918 | $15,600 | $14,457,199 |
| 2013 | $1,500,000 | $5,200,000 | $7,915,912 | $2,923,069 | $3,838 | $15,300 | $17,558,119 |
| 2012 | $1,049,188 | $2,090,162 | $2,250,000 | $5,217,414 | $4,215 | $1,766,529 | $12,377,508 |

20.     Defendant Michael E. O'Neill ("O'Neill") is Citigroup's Chairman of the Board and has been since April 2012 and a director and has been since April 2009.  Defendant O'Neill is also a member of Citigroup's Audit Committee and has been since at least March 2014; a member of the Ethics and Culture Committee and has been since at least March 2015; and a member of the Nomination, Governance, and Public Affairs Committee in at least March 2013 and again since March 2015.  Defendant O'Neill knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant O'Neill purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant O'Neill also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant O'Neill the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $500,000 | - | $500,000 |
| 2013 | $500,000 | - | $500,000 |
| 2012 | $225,000 | $150,000 | $375,000 |

21.     Defendant Judith Rodin ("Rodin") is a Citigroup director and has been since September 2004.  Defendant Rodin is also a member of Citigroup's Ethics and Culture Committee and has been since at least March 2015; a member of the Nomination, Governance, and Public Affairs Committee since at least March ██████████████████████████████ ██████████████████████████████████   Defendant Rodin was a member of the then separate Public Affairs Committee in at least March 2011.  Defendant Rodin knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Rodin purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Rodin also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant Rodin the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $93,750 | $150,000 | $243,750 |
| 2013 | $75,000 | $150,000 | $225,000 |
| 2012 | $75,000 | $150,000 | $225,000 |

22.     Defendant Anthony M. Santomero ("Santomero") is a Citigroup director and has been since April 2009.  Defendant Santomero is also a member of Citigroup's Audit Committee and has been since at least March 2011 and was Chairman of that committee in at least March 2014.   Defendant Santomero is Chairman of Citigroup's Risk Management and Finance Committee (also known at times at the Risk Management Committee) and has been since at least March 2015 and a member of that committee since at least March 2011.  Defendant Santomero was previously Chairman of the Risk Management and Finance Committee from at least March 2012 to at least March 2013.  ████████████████████████████████████

████████████████████████████████████  Defendant Santomero knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.   Defendant Santomero purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.   Defendant Santomero also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements. Citigroup paid defendant Santomero the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $228,750 | $150,000 | $378,750 |
| 2013 | $236,250 | $150,000 | $386,250 |
| 2012 | $225,000 | $150,000 | $375,000 |

23.     Defendant William S. Thompson, Jr. ("Thompson") is a Citigroup director and has been since April 2009.  Defendant Thompson is also a member of Citigroup's Risk Management and Finance Committee and has been since at least March 2015 and a member of that committee in at least March 2011 and Chairman in at least March 2014.  Defendant Thompson was a member of Citigroup's Audit Committee from at least December 2011 to at least March 2012; █ ███████████████████████████████████████████████████ and a member of the Nomination, Governance, and Public Affairs Committee since at least March 2012.  Defendant Thompson was also a member of the then separate Nomination and Governance Committee in at least March 2011.  Defendant Thompson knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Thompson purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Thompson also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.   Citigroup paid defendant Thompson the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $128,750 | $150,000 | $278,750 |
| 2013 | $101,250 | $150,000 | $251,250 |
| 2012 | $75,000 | $150,000 | $225,000 |

24.     Defendant Diana L. Taylor ("Taylor") is a Citigroup director and has been since July 2009.  Defendant Taylor is also the Chairman of Citigroup's Nomination, Governance, and Public Affairs Committee and has been since at least March 2012.  Defendant Taylor was the Chairman of the then separate Nomination and Governance Committee in at least March 2011. Defendant Taylor knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Taylor purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with the BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Taylor also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant Taylor the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $210,000 | $150,000 | $360,000 |
| 2013 | $206,250 | $150,000 | $356,250 |
| 2012 | $221,250 | $150,000 | $371,250 |

25.     Defendant Ernesto Zedillo Ponce de Leon ("Zedillo") is a Citigroup director and has been since April 2010.  Defendant Zedillo is also a member of Citigroup's Ethics and Culture Committee and has been since at least March 2015; a member of the Nomination, Governance, and Public Affairs Committee and has been since at least March 2013; a member of the Risk Management and Finance Committee and has been since at least March 2011; ███████████████

███████████████████████████████████████.  Defendant Zedillo

was a member of the then separate Public Affairs Committee in at least March 2011.  Defendant

Zedillo knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable

law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption,

and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an

adequate system of internal controls at Banamex and BUSA, including controls sufficient to

ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant

Zedillo purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur

fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA,

including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the

risk of fraud loss.  Defendant Zedillo also violated section 14(a) of the Exchange Act by causing

Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup

paid defendant Zedillo the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $93,750 | $150,000 | $243,750 |
| 2013 | $83,750 | $150,000 | $233,750 |
| 2012 | $148,750 | $150,000 | $298,750 |

26.      Defendant Franz B. Humer ("Humer") is a Citigroup director and has been since

April 2012.  Defendant Humer is also Chairman of Citigroup's Ethics and Culture Committee and

has been since at least March 2015 and a member of the Risk Management and Finance

Committee and has been since at least March 2014.  Defendant Humer knew, at relevant times,

that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML;

(ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering;

and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal

controls at Banamex and BUSA, including controls sufficient to ensure compliance with

BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Humer purposefully,

knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Humer also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant Humer the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $113,750 | $150,000 | $263,750 |
| 2013 | $125,000 | $150,000 | $275,000 |
| 2012 | $81,250 | $112,500 | $193,750 |

27.     Defendant Joan E. Spero ("Spero") is a Citigroup director and has been since April 2012.  Defendant Spero was a member of Citigroup's Audit Committee from at least April 2012 to at least March 2015 ███████████████████████████████████

███     Defendant Spero knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Spero purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Spero also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements. Citigroup paid defendant Spero the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $125,000 | $150,000 | $275,000 |
| 2013 | $125,000 | $150,000 | $275,000 |
| 2012 | $93,750 | $112,500 | $206,250 |

28.    Defendant Gary M. Reiner ("Reiner") is a Citigroup director and has been since July 2013.  Defendant Reiner knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Reiner purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Reiner also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2014-2015 Proxy Statements. Citigroup paid defendant Reiner the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $132,500 | $150,000 | $282,500 |
| 2013 | $62,500 | $75,000 | $137,500 |

29.    Defendant James S. Turley ("Turley") is a Citigroup director and has been since July 2013.  Defendant Turley is also the Chairman of Citigroup's Audit Committee and has been since at least March 2015 and a member of that committee and has been since at least July 2013. Defendant Turley is a member of Citigroup's Risk Management and Finance Committee and has been since at least March 2015.  Defendant Turley knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA

posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Turley purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Turley also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2014-2015 Proxy Statements.  Citigroup paid defendant Turley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $162,500 | $150,000 | $312,500 |
| 2013 | $62,500 | $75,000 | $137,500 |

30.    Defendant Duncan P. Hennes ("Hennes") is a Citigroup director and has been since December 2013.  Defendant Hennes is also a member of Citigroup's Risk Management and Finance Committee and has been since December 2013 ███████████████████████ ████████████████████████████ Defendant Hennes knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Hennes purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those

necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Hennes also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2014-2015 Proxy Statements.   Citigroup paid defendant Hennes the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $151,250 | $150,000 | $301,250 |
| 2013 | $17,857 | $21,428 | $39,285 |

31.     Defendant Eugene M. McQuade ("McQuade") is a Citigroup director and has been since July 2015.  Defendant McQuade was also Citigroup's Vice Chairman from April 2014 to May 2015 and CEO for Citibank from July 2009 to March 2014. ████████████

███████████████████████████████████████.  Defendant McQuade knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant McQuade purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.   Citigroup paid defendant McQuade the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $500,000 | $2,800,000 | $2,100,000 | $4,284,159 | $15,000 | $9,699,159 |

32.     Defendant Robert L. Ryan ("Ryan") was a Citigroup director from July 2007 to April 2015.  Defendant Ryan was also a member of Citigroup's Audit Committee from at least March 2011 to at least March 2015 and a member of the Risk Management and Finance Committee from at least March 2011 to at least March 2012.    Defendant Ryan knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Ryan purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Ryan also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2013-2015 Proxy Statements.  Citigroup paid defendant Ryan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2014 | $182,500 | $150,000 | $332,500 |
| 2013 | $175,000 | $150,000 | $325,000 |
| 2012 | $175,000 | $150,000 | $325,000 |

33.     Defendant Lawrence R. Ricciardi ("Ricciardi") was a Citigroup director from July 2008 to April 2013.  Defendant Ricciardi was also the Chairman of Citigroup's Audit Committee from at least March 2011 to at least March 2013.  Defendant Ricciardi knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal

controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Ricciardi purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Citigroup paid defendant Ricciardi the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $87,500 | $37,500 | $125,000 |
| 2012 | $175,000 | $150,000 | $325,000 |

34.    Defendant Robert L. Joss ("Joss") was a Citigroup director from July 2009 to April 2014. Defendant Joss was also a member of Citigroup's Risk Management and Finance Committee from at least March 2011 to at least March 2014. Defendant Joss knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Joss purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Joss also violated section 14(a) of the Exchange Act by causing Citigroup to make false and misleading statements in its 2014-2015 Proxy Statements. Citigroup paid defendant Joss the following compensation as a director:

-19-

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $62,500 | $37,500 | $87,500 | $187,500 |
| 2013 | $175,000 | $150,000 | $350,000 | $675,000 |
| 2012 | $162,500 | $150,000 | $350,000 | $662,500 |

35.     Defendant Vikram S. Pandit ("Pandit") was Citigroup's CEO and a director from December 2007 to October 2012.  Defendant Pandit was also Chairman and CEO of Citigroup's Institutional Clients Group from at least November 2007 to December 2007 and Chairman of Citi Alternative Investments in at least 2007.  Defendant Pandit knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Defendant Pandit purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Citigroup paid defendant Pandit the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $1,750,000 | $2,661,333 | $3,998,589 | $1,129,768 | $15,000 | $9,554,690 |

36.     Defendant John P. Davidson III ("Davidson") is Citigroup's Chief Compliance Officer and has been since at least October 2013.  Defendant Davidson also served as Citigroup's Head of Enterprise Risk Management from April 2008 to at least October 2013 and Risk Chief Administrative Officer responsible for Infrastructure Risk Management from November 2008 to August 2011.

37.     Defendant Bradford Hu ("Hu") is Citigroup's Chief Risk Officer and has been since January 2013.  Defendant Hu also served as Citigroup's Chief Risk Officer for Asia from at least 2009 to 2012.

38.     Defendant Ernesto Torres Cantu ("Torres") is Citigroup Mexico's CEO and has been since October 2014 and Banamex's CEO and has been since January 2012.  Defendant Torres is also a member of the Board for Citi Mexico and Banamex.

39.     Defendant Manuel Medina-Mora ("Medina-Mora") is the non-executive Chairman of the board of directors of Grupo Financiero Banamex, S.A. de C.V. and of Banamex and has been since June 2015.  Defendant Medina-Mora was Citigroup's Co-President from January 2013 to June 2015; CEO of Global Consumer Banking from November 2011 to June 2015; and Executive Chairman of Citigroup's franchise in Mexico from 2004 to June 2015.  Defendant Medina-Mora was also CEO of Citigroup Consumer Banking for the Americas and Chairman of Citigroup's Global Consumer Council from January 2010 to November 2011; Chairman of Citigroup Latin America ("LATHAM") from 2004 to at least December 2012; and CEO of Citigroup LATHAM from 2004 to November 2011. Defendant Medina-Mora was CEO of Banamex from 1996 to 2004 and held various other positions with Banamex beginning in 1971. Defendant Medina-Mora knew, at relevant times, that: (i) Citigroup and its subsidiaries were subject to applicable law, including BSA/AML; (ii) Banamex and BUSA posed a heightened risk for fraud, corruption, and money laundering; and (iii) Citigroup needed, but failed, to implement and maintain an adequate system of internal controls at Banamex and BUSA, including controls sufficient to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss. Defendant Medina-Mora purposefully, knowingly, or recklessly allowed Citigroup to violate BSA/AML and incur fraud loss by failing to implement or maintain adequate internal controls at

Banamex and BUSA, including those necessary to ensure compliance with BSA/AML and to sufficiently mitigate the risk of fraud loss.  Citigroup paid defendant Medina-Mora the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | Total |
|------|--------|-------|--------------|----------------------------------------|-------------------------|-------|
| 2014 | $546,966 | $3,581,214 | $5,322,066 | $710,768 | - | $10,161,014 |
| 2013 | $546,966 | $3,581,214 | $6,489,965 | $3,394,405 | - | $14,012,550 |
| 2012 | $546,966 | $4,181,214 | $2,852,650 | $5,967,649 | $1,583,395 | $15,131,874 |

40.     Defendant Kevin L. Thurm ("Thurm") was Citigroup's Chief Compliance Officer from at least January 2013 to at most October 2013.  Defendant Thurm also served as Citigroup's Deputy General Counsel, Chief Administrative Officer of Consumer Banking North America, Director for Administration in the Corporate Center, Chief of Staff to the President and Chief Operating Officer, and Director of Consumer Planning in the Global Consumer Group.

41.     Defendant Brian Leach ("Leach") was Citigroup's Head of Franchise Risk & Strategy from January 2013 to April 2015 and Chief Risk Officer from March 2008 to January 2013.  Citigroup paid defendant Leach the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $500,000 | $6,073,047 | $5,052,764 | $1,383,966 | $15,600 | $13,025,377 |
| 2013 | $500,000 | $9,449,794 | $2,550,000 | $1,407,339 | $15,300 | $13,922,433 |
| 2012 | $500,000 | $3,400,000 | $2,550,000 | $720,481 | $15,000 | $7,185,481 |

42.     Defendant Javier Arrigunaga ("Arrigunaga") was Chief Executive Officer of Grupo Financiero Banamex from November 2011 to October 2014.

43.     The defendants identified in ¶¶19, 31, 35-42 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶19-35 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶20, 22-23, 27, 29, 32-33 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶21-23, 25, 27, 30-32 are referred

to herein as the "Compliance Committee Defendants."  The defendants identified in ¶¶22-23, 25-26, 29-30, 32, 34 are referred to herein as the "Risk Management and Finance Committee Defendants."  The defendants identified in ¶¶20-21, 23-25 are referred to herein as the "Nomination, Governance and Public Affairs Committee Defendants."  The defendants identified in ¶¶20-21, 25-26 are referred to herein as the "Ethics and Culture Committee Defendants."  Collectively, the defendants identified in ¶¶19-42 are referred to herein as the "Individual Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

44.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Citigroup and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Citigroup in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Citigroup and not in furtherance of their personal interest or benefit.

45.   To discharge their duties, the officers and directors of Citigroup were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Citigroup were required to, among other things:

(a)   implement and maintain a system of internal controls, including those sufficient to ensure legal and regulatory compliance, including with BSA/AML, effective risk management, financial reporting, and compliance with internal policies at each of Citigroup's subsidiaries worldwide, including Banamex and BUSA;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Citigroup conducted its operations, including at its subsidiaries, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     properly and accurately guide investors when presenting decisions to them.

**B.     Breaches of Duties**

46.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Citigroup, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

47.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to violate BSA/AML, and by failing to implement and maintain a system of internal controls, including those sufficient to ensure legal and regulatory compliance, particularly with BSA/AML, effective risk management and financial reporting, and compliance with Citigroup policies at Banamex and BUSA.

48.     The Individual Defendants also breached their duty of loyalty and good faith and caused Citigroup to incur substantial damage by allowing defendants to cause, or by themselves causing, the materially misleading 2013-2015 Proxy Statements.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Citigroup, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Citigroup has expended, and will continue to expend, significant sums of money.

### C.      Code of Conduct and Code of Ethics

50.     In addition to breaching their general fiduciary duties discussed above, the Individual Defendants breached their duties under the Company's Code of Conduct.  The Code of Conduct applies to all Citigroup employees, including the Board, and requires compliance with BSA/AML, as well as protection of Company assets.  The Officer Defendants also breached their duties under the Company's Code of Ethics for Financial Professionals.  The Code of Ethics for Financial Professionals applies to Citigroup's executive officers and requires, "[c]ompl[iance] with applicable governmental laws, rules and regulations, as well as the rules and regulations of self-regulatory organizations of which Citi or its subsidiaries is a member."

### D.      Additional Duties of the Audit Committee Defendants

51.     In addition to the general duties discussed above, under its Charter, the Audit Committee Defendants, defendants O'Neil, Santomero, Thompson, Spero, Ryan, Ricciardi, and Turley owed specific duties to Citigroup to assist the Board in overseeing "the performance of the internal audit function" and "Citigroup's compliance with legal and regulatory requirements, including Citigroup's disclosure controls and procedures" (among others).  In particular, the Audit Committee Defendants' compliance and regulatory oversight duties include:

- Review and discuss with management, at least annually, the implementation and effectiveness of each of the Company's compliance and ethics program, including the processes for resolution of compliance

and ethics issues and, in connection with such review, obtain, at least annually, from the Chief Compliance Officer (and the other persons, if any, with operational responsibility for the Company's compliance and ethics program) reports regarding the implementation and effectiveness of such program….

- ***Review and discuss with management, at least annually, the effectiveness of the Company's anti-money laundering compliance program (the "AML Program"), and recommend to the Board approval of material changes to the AML Program.***

\* \* \*

- ***Receive regular reports on the schedule and results of significant regulatory examinations in the United States and abroad, including the nature and status of corrective actions.***

- ***Receive regular reports on significant issues that potentially create regulatory attention, including briefings on business decisions or significant issues that arise in areas on which the regulators are focused or that otherwise generate regulatory scrutiny or actions.***

- ***Oversee and receive reports on ongoing regulatory projects, including regular updates on significant long-term projects being implemented in response to particular regulatory issues or concerns, except to the extent another Committee of the Board receives reports on specific regulatory projects.***

- ***Receive periodic briefings on the key controls and processes in specific business or functional areas, in particular with respect to areas that are the subject of regulatory concern.***

\* \* \*

- ***Receive and discuss reports from management on an annual and as needed basis relating to:***

  o  significant reported ethics violations;
  o  ***compliance with regulatory internal control and compliance reporting requirements***….
  o  ***fraud and operating losses;***
  o  ***internal and external fraud incidents, and associated control enhancements and remediation plans***;

Other specific duties imparted on the Audit Committee Defendants via the Audit Committee

Charter include:

- "Review and discuss any significant Internal Audit findings that have been reported to management, management's responses, and the progress of the related corrective action plans."

- "With respect to operational risk, review with management matters related to the effectiveness of Citigroup's control environment and the status of corrective actions."

- "Review and discuss with management, at least annually, the Company's policies and control systems used to manage third-party vendor relationships."

The Charter further required the Audit Committee Defendants to "[r]egularly report to the Board on the Committee's activities."

### E.   Additional Duties of the Risk Management Committee Defendants

52.   In addition to the general duties discussed above, under its Charter, the Risk Management Committee Defendants, defendants Santomero, Thompson, Zedillo, Humer, Turley, Hennes, Ryan, and Joss owed specific duties to Citigroup to assist the Board in overseeing risk management.   In particular, the Risk Management Committee Defendants' risk management oversight duties include:

- "Review and approve Citigroup's key risk policies on the establishment of risk limits and receive reports on Citigroup's adherence to significant limits."

- "Receive reports from, review with, and provide feedback to, Management on … *operational risk*," including the exposures, significant concentrations, the metrics used to monitor the exposures, and management's views on the acceptable and appropriate levels of those risk exposures.

- "In consultation with the Audit Committee, review and discuss with Management, at least annually:

    o   the key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management; and
    o   Citigroup's major financial risk exposures and the steps Management has taken to monitor and control such exposures."

- Review the adequacy and frequency of risk reporting to the Board.

-27-

The Charter further required the Risk Management Committee Defendants to "[r]egularly report to the Board on the Committee's activities," and "share information with the Audit Committee of the Board of Directors as necessary and appropriate to permit the Audit Committee to carry out its statutory, regulatory and other responsibilities."   Throughout the relevant period, the Risk Management Committee members regularly attended Citibank's Compliance Committee meetings.

**F.     Additional Duties of the Nomination, Governance and Public Affairs Committee Defendants**

53.     In addition to the general duties discussed above, under its Charter, the Nomination, Governance and Public Affairs Committee Defendants, defendants O'Neill, Rodin, Thompson, Taylor, and Zedillo owed specific duties to Citigroup in "leading the Board in its annual review of the Board's performance" and to assist the Board in overseeing, "the Company's policies and programs that relate to public issues of significance to the Company and the public at large, and … the Company's relationships with external constituencies and issues that impact the Company's reputation, and advising management as to its approach to each."   In particular, the Nomination, Governance and Public Affairs Committee Defendants' duties include:

- Review and assess the adequacy of the Company's policies and practices on corporate governance including the Corporate Governance Guidelines of the Company and recommend any proposed changes to the Board for approval.

\* \* \*

- Receive reports from and advise management on the public policy and reputation issues facing Citi.

\* \* \*

- ***Review and advise management on Citi's global business practices and ethics***, ***particularly as they relate to the reputation of the Company***, including the opportunities and challenges of operating in many diverse

cultures around the world. The Company's internal Business Practices Committee shall provide reports to the Committee or to the Board at least annually.

The Charter further required the Nomination, Governance and Public Affairs Committee Defendants to "[r]egularly report to the Board on the Committee's activities."

### G.    Additional Duties of the Ethics and Culture Committee Defendants

54.    In addition to the general duties discussed above, under its Charter, the Ethics and Culture Committee Defendants, defendants O'Neill, Rodin, Zedillo, and Humer, owed specific duties to Citigroup to:

- Review and assess the culture of the organization to determine if further enhancements are needed to foster ethical decision-making by employees.

\* \* \*

- In furtherance of these responsibilities, the Committee may, from time to time, review and/or provide input to Management on:

  - The implementation and effectiveness of Citi's ethics and culture initiatives, including training on ethical decision-making and the processes for the reporting and resolution of ethics issues. The Committee may obtain from the Chief Compliance Officer – and any other individuals with operational responsibility for Citi's ethics and culture initiatives – reports on these initiatives.

The Charter further required the Ethics and Culture Committee Defendants to "[r]egularly report to the Board on the Committee's activities."

### V.    THE INDIVIDUAL DEFENDANTS KNOWINGLY FAIL TO IMPLEMENT NECESSARY CONTROLS AT BANAMEX AND BUSA

55.    The Individual Defendants breached their fiduciary duty by knowingly failing to implement and maintain internal controls at Banamex and BUSA. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████     ███████████

███████████████████████████████████████████████████

████████████     The Board's failures have already resulted in a $140 million fine from U.S. authorities, a $2.2 million fine from Mexican authorities, and the closure of BUSA. The Company has and will continue to incur substantial fines and other monetary damages due to Individual Defendants' failures.

### A.     Applicable Law

56.     The BSA establishes program, recordkeeping, and reporting requirements for national banks, federal savings associations, federal branches, and agencies of foreign banks. Generally, a company must implement and maintain a BSA/AML compliance program commensurate with its risk profile. The following paragraphs provide a non-exhaustive overview of BSA/AML requirements.

57.     Implementing regulation 12 CFR §21.21 requires financial institutions implement a BSA/AML program that, at a minimum:

- provides for a system of internal controls to assure ongoing compliance;

- provides for independent testing for compliance;

- designates an individual responsible for coordinating and monitoring day-to-day compliance; and

- provides training for appropriate personnel.

58.     Implementing regulations 12 CFR §21.11 and 12 CFR §163.180 require every national bank to file a Suspicious Activity Report ("SAR") when they detect certain known or suspected violations of federal law or suspicious transactions related to a money-laundering activity or a violation of the BSA/AML. A SAR filing is required for any potential crimes:

- involving insider abuse regardless of the dollar amount;

- where there is an identifiable suspect and the transaction involves $5,000 or more;

- where there is no identifiable suspect and the transaction involves $25,000 or more; and

- where there is suspicious activity that is indicative of potential money laundering or BSA violations and the transaction involves $5,000 or more.

In addition, implementing regulation 31 CFR §1010.310 requires financial institutions to file a Currency Transaction Report ("CTR") whenever a currency transaction exceeds $10,000.

59.     In 2001, the BSA was amended to incorporate the USA PATRIOT Act, and its implementing regulations jointly promulgated by the OCC and the U.S. Department of the Treasury at 31 CFR §1020.220.   Implementing regulation, 31 CFR §1020.220, requires implementation of a written Customer Identification Program ("CIP") appropriate for the bank's size and risk profile, as part of its BSA/AML compliance program.  The CIP must include identity verification procedures.  At minimum, the identity verification procedures must include:

- ***risk-based procedures*** for verifying the identity of each customer to the extent reasonable and practicable. The procedures must enable the bank to form a reasonable belief that it knows the true identity of each customer. These procedures must be based on the bank's assessment of the relevant risks, including those presented by the various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base.

- "procedures for opening an account that specify the identifying information that will be obtained from each customer" which at minimum must include name, date of birth, address, and identification number.

60.     Section 312 of the USA PATRIOT Act requires special due diligence for accounts requested or maintained by, or on behalf of, foreign banks and non-U.S. persons.  The enhanced due diligence ("EDD") policies, procedures, and controls required for foreign banks shall, at a minimum:

[E]nsure that the financial institution in the United States takes reasonable steps (i) to ascertain for any such foreign bank, the shares of which are not publicly traded, the identity of each of the owners of the foreign bank, and the nature and extent of the ownership interest of each such owner; (ii) to conduct enhanced

scrutiny of such account to guard against money laundering and report any suspicious transactions under subsection (g); and (iii) to ascertain whether such foreign bank provides correspondent accounts to other foreign banks and, if so, the identity of those foreign banks and related due diligence information.

The EDD policies, procedures, and controls required for non-U.S. persons shall, at a minimum:

[E]nsure that the financial institution takes reasonable steps (A) to ascertain the identity of the nominal and beneficial owners of, and the source of funds deposited into, such account as needed to guard against money laundering and report any suspicious transactions under subsection (g); and (B) to conduct enhanced scrutiny of any such account that is requested or maintained by, or on behalf of, a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure that is reasonably designed to detect and report transactions that may involve the proceeds of foreign corruption.

Implementing regulation 31 CFR §1010.610 further *requires a due diligence program that includes "specific, risk-based, and, where necessary, enhanced policies, procedures, and controls" for the correspondent accounts of foreign financial institutions.*

61.     The Office of Foreign Assets Control ("OFAC") regulations, though not technically part of the BSA, are related to the BSA/AML.  OFAC regulations require financial institutions to ensure that their business operations and transactions do not violate U.S. economic and trade sanctions against entities such as targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction.  OFAC regulations apply not only to U.S. banks, their domestic branches, agencies, and international banking facilities, but also to their foreign branches, and overseas offices and subsidiaries.   In general, OFAC regulations require that financial institutions: (i) block accounts and other property of specified countries, entities, and individuals; and (ii) prohibit or reject unlicensed trade and financial transactions with specified countries, entities, and individuals.  OFAC operates under a clause of strict liability—if a sanctioned transaction is

processed, there is a violation of law.  OFAC has the authority to assess Civil Money Penalties

("CMPs") against financial institutions that violate OFAC regulations/U.S. sanctions.

62.     The existence, nature, and adequacy of a financial institution's OFAC compliance

program are critical to OFAC's calculation of applicable CMPs for apparent violations.   A

financial institution must implement an OFAC compliance program commensurate to its risk

profile.   Specifically, the program must: (i) identify high-risk business areas and potential

sanctions exposure; (ii) provide for appropriate internal controls for screening, reporting,

recordkeeping, due diligence, and updating; (iii) establish independent testing/audits for

compliance; (iv) designate a bank employee for OFAC compliance; and (v) create and implement

training programs.  Like most financial institutions, Citigroup's OFAC compliance program is

organized as a part of its BSA/AML compliance program.  Accordingly, the BSA/AML as

referred to herein also includes OFAC regulations.

63.     On July 17, 2013, Mexico's Anti-Money Laundering Law ("Mexico AML") went

into effect.  It includes several similar requirements as the BSA/AML.  Mexico AML is referred

to herein as a part of BSA/AML.

**Citigroup's Operations at BUSA and Banamex Violate the BSA/AML**

64.     On July 22, 2015, the FDIC announced that it had levied a $140 million penalty

against BUSA for violations of the BSA/AML.[4]  The $140 million penalty is the largest fine of its

kind imposed by the FDIC and comes as a result of the FDIC/CDBO's determination that BUSA

"failed to implement an effective BSA/AML Compliance Program over an extended period of

time."  Specifically, BUSA "failed to retain a qualified and knowledgeable BSA officer and

sufficient staff, maintain adequate internal controls reasonably designed to detect and report illicit

---

[4] The FDIC will receive $100 million of the fine and the CDBO will receive $40 million.

financial transactions and other suspicious activities, provide sufficient BSA training, and conduct effective independent testing."[5]

65.     Unfortunately for Citigroup and its stockholders, the BSA/AML violations uncovered at BUSA are only the beginning of the BSA/AML issues at Citigroup concerning its operations in Mexico.  The DOJ's investigation of potential BSA/AML violations at BUSA also implicated Banamex.  Accordingly, the DOJ has turned its attention to Banamex.  In January 2015, the DOJ sent a subpoena to Banamex through Mexico's banking commission demanding certain records related to its BSA/AML compliance program.  The DOJ's collaboration with Mexico's banking commission requires considerable intergovernmental negotiation, and therefore indicates the severity of the DOJ's suspicions and also opens Banamex up to scrutiny by Mexican regulators.[6]  Specifically, the DOJ sought records regarding the relationship between Banamex and BUSA, due diligence for cross-border transactions between Banamex and BUSA, and hundreds of clients' records.[7]  The DOJ seeks to determine whether Citigroup allowed its customers to move illicit money through its BUSA and Banamex entities.

66.     As recently reported by Bloomberg on August 17, 2015, the DOJ's investigation of BSA/AML controls at Banamex also concerns Citigroup's dealings with companies linked to Mexican billionaire Carlos Hank Rhon.

67.     ██████████████████████████████████████

████████████████████████████████████████████

---

[5] *See FDIC and CDBO Assess Civil Money Penalties Against Banamex USA, Century City, CA*, Federal Deposit Insurance Company, July 22, 2015, https://www.fdic.gov/news/news/press/2015/pr15061.html.

[6] *See* Alan Katz & Dakin Campbell, *Citigroup's Mexico Unit Faces Widening U.S. Money-Laundering Probe*, Bloomberg, July 24, 2015, http://www.bloomberg.com/news/articles/2015-07-24/citigroup-s-mexico-unit-faces-widening-u-s-laundering-probe.

[7] *See supra* note 6.

BUSA.  In fact, as detailed herein, similar control failures that resulted in BSA/AML violations and a substantial regulatory fine at BUSA, have also existed at Banamex for an extended period of time.

    **B.**    **The Individual Defendants Knew of the Control Deficiencies at Banamex and BUSA that Resulted in BSA/AML Violations**

    68.    The Individual Defendants caused the BSA/AML violations at Banamex and BUSA by knowingly or recklessly failing to implement and maintain adequate controls over BSA/AML compliance.  ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

Moreover, for years, constant regulatory scrutiny ████████████████████ the Board with a steady influx of information unequivocally identifying deficient or absent BSA/AML controls at Banamex and BUSA.  Yet, the Board utterly failed to take action necessary to bridge program gaps or effect necessary fixes to deficient controls.  The following summary of facts (which are described in detail in the following sections) known to the Board demonstrates their knowledge of the inadequate control yet failure to act:

- Citigroup has a long-history of money laundering (*see infra* Section V(B)(1));

- At the same time investigations found money laundering at Citigroup, Citigroup acquired Banamex (including BUSA's predecessor), another known launderer of drug-money (*see infra* Section V(B)(2));

- Banamex quickly became Citigroup's most important business unit (*see infra* Section V(B)(2));

- Citigroup has been the subject of substantial regulatory scrutiny regarding its BSA/AML compliance program since at least 2008, and BUSA has been the

specific subject of substantial regulatory scrutiny since at least early 2012 (*see infra* Section V(B)(3)-(4));

- ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████

- BSA/AML issues (especially in Mexico) had been receiving heightened regulatory scrutiny and  received record monetary fines (*see infra* Section V(B)(5));

- ████████████████████████████████████████████

  ██████████████████    ████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████    ██████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████

- ████████████████████████████████████████████

  ████████████████████████

- ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████

- ████ ██ ███ ███ ████████ ███ ██ █ ████
  ████████████████████████████
  ████████████████████████████
  ███████████████████

- █████████████████████████████
  █████████████████████████████
  ███████████████████████

- █████████████████████████████
  █████████████████████████████
  ████████████████

- █████████████████████████████
  ████████████████████████████

- █████████████████████████████
  ██████████████████

- █████████████████████████████
  █████████████████████████████
  █████████████████████████████
  █████████████████████████████
  ██████████████████

- █████████████████████████████
  ██████████████████

1.    **Citigroup's Long History of Money Laundering**

69.    The U.S. government and media have implicated Citigroup in money laundering, including in connection with Mexico, since at least the late 1990s.  In 1998, U.S. congressional investigators found that "Citigroup helped Raul Salinas de Gortari, brother of former Mexican President Carlos Salinas de Gortari, move as much as $100 million [of suspected drug-money] from Mexico to Switzerland and London through shell companies and multiple accounts."[8]  Also in 1998, U.S. authorities seized $1.8 million from Citibank accounts as part of one of the biggest undercover money-laundering investigations in United States history.[9]  Still, Citigroup continued to allow Mexican drug money to move through its banks.[10]

70.    Around the same time, a Senate investigation also "criticized Citigroup's relationship with political figures including the sons of Nigeria's former military leader General Sani Abacha and El Hadj Omar Bongo, president of Gabon, and Asif Ali Zardari, the president of Pakistan and husband of slain prime minister Benazir Bhutto."[11]  Similarly, in 2000, the General Accounting Office found that Citigroup had opened more than 100 accounts held by Russians suspected of money laundering.

---

[8]  *See* Jesse Hamilton & Donal Griffin, *Citigroup Ordered to Bolster Its Money-Laundering Safeguards*, Bloomberg, Apr. 5, 2012, http://www.bloomberg.com/news/articles/2012-04-05/citigroup-ordered-to-bolster-its-money-laundering-safeguards-2-.

[9]  *See* Tim Golden, *Citibank Criticized for Slow Response to Money Laundering Scheme*, N.Y. Times, Feb. 27, 2001, http://www.nytimes.com/2001/02/27/world/27LAUN.html.

[10]  *See supra* note 9.

[11]  *See supra* note 8.

### 2. Citigroup Acquires Banamex Amid Widespread Reports of Drug Money Laundering, Banamex Quickly Becomes Citigroup's Most Important Business Unit

71.    Citigroup purchased Banamex and BUSA's predecessor in August 2001 for $12.5 billion.  Citigroup's acquisition of Banamex/BUSA came on the heels of widespread reports that Citigroup acquiesced in drug money laundering.[12]

72.    At the same time Citigroup began its acquisition of Banamex/BUSA, there were wide reports that Banamex was involved in drug money laundering.[13]  Even Banamex's majority owner and director at the time, Roberto Hernandez, had been implicated as a drug trafficker.[14]  Though Banamex attempted to bring a libel suit against the journalist and publication that implicated Mr. Hernandez, after a two-year trial, a Mexican judge dismissed the libel suit holding that the accusations were based in fact.  Banamex's appeal of that decision failed.  Mr. Hernandez, however, still received a seat on Citigroup's Board after the Company's acquisition of Banamex, a position he held until 2009.[15]

---

[12] *See supra* note 8; *see also* Michael C. Ruppert, *Citibank's Senior Manager for Government Relations, Nora Slatkin Played Key Role in John Deutch Investigation – Former Number 3 at CIA*, May 31, 2001, http://www.drugwar.com/cv33.shtm.

[13] *See* Michael C. Ruppert, *All Hell Breaks Loose*, May 31, 2001, http://www.fromthewilderness.com/free/ciadrugs/053101_Citigroupandasa.html; *see also* U.S. Attorney's Office, *Former Governor of Mexican State Extradited for Conspiring to Import Hundreds of Tons of Cocaine and Laundering Millions in Bribe Payments Through Lehman Brothers*, May 10, 2010, https://www.fbi.gov/newyork/press-releases/2010/nyfo051010.htm (discussing transfers of drug money through Banamex); *see* Department of Justice U.S. Attorney's Office Southern District of New York, *Former Governor of Mexican State Sentenced in Manhattan Federal Court to 131 Months in Prison for Money Laundering in Connection with Narcotics Bribes*, June 28, 2013, http://www.justice.gov/usao-sdny/pr/former-governor-mexican-state-sentenced-manhattan-federal-court-131-months-prison-money (same).

[14] *See* Sean Dodson, *Hacks Hit in Drugs* War, The Guardian, June 25, 2001, http://www.theguardian.com/media/2001/jun/25/mondaymediasection11.

[15] *See supra* note 14.

73.     Since its acquisition, Banamex has quickly become Citigroup's most important business unit.  In recent years, Banamex has accounted for a substantial portion—***about 10%***—of Citigroup's revenue.  It also has about 1,500 branches—***almost twice as many as Citigroup has in the U.S.***—and is Mexico's second largest bank.

### 3.     Citigroup Continually Violates BSA/AML Requirements

74.     Over the past decade, Citigroup has established a pattern of attempting to placate regulators by agreeing to make necessary corrections to deficient BSA/AML controls, then failing to effectuate the required changes.  In 2004, Japanese regulators forced Citigroup to close its private banking business in Japan due to anti-money laundering control failures.[16]  Citigroup was only able to reopen its business in Japan after submitting an improvement plan to Japanese regulators.  *Id*.  Then, in 2009, Japan's financial regulator forced Citigroup to suspend some of its operations in the country due, in part, to the Company's failure to implement its proffered improvement plan.  As of 2009, Citigroup's anti-money laundering controls in Japan still had "fundamental problems."

75.     ████████████████████████████████████████

████████████      ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

- ██████████████████████████████████████

  ████████

---

[16] *See supra* note 8.



76.     Despite these obligations, Citigroup's deficient BSA/AML controls continued into 2012, thus prompting the OCC to take further action.  On April 5, 2012, the OCC issued the OCC Consent Order to supersede the 2010 Consent Order due to Citigroup's still noncompliant

BSA/AML controls.   The OCC's findings underlying its OCC Consent Order identified substantially the same control weaknesses that Citigroup was supposed to remediate pursuant to the 2010 Consent Order.  Specifically, the OCC found that:

> (1) ...the Bank has deficiencies in its BSA/AML compliance program. These deficiencies have resulted in a BSA/AML compliance program violation under 12 U.S.C. §1818(s) and its implementing regulation, 12 C.F.R. §21.21 (BSA Compliance Program). In addition, the Bank has violated 12 C.F.R. §21.11 (Suspicious Activity Report Filings); and 31 U.S.C. §5318(i) and its implementing regulation, 31 C.F.R. §1010.610 (Correspondent Banking).

> (2) The Bank has failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate system of internal controls and ineffective independent testing. *The Bank did not develop adequate due diligence on foreign correspondent bank customers and failed to file Suspicious Activity Reports ("SARs") related to its remote deposit capture/international cash letter instrument activity in a timely manner.*

> (3) Some of the *critical deficiencies* in the elements of the Bank's BSA/AML compliance program *include the following*: (a) The Bank has internal control weaknesses including the *incomplete identification of high risk customers* in multiple areas of the bank, inability to assess and monitor client relationships on a bank-wide basis, inadequate scope of periodic reviews of customers, weaknesses in the scope and documentation of the validation and optimization process applied to the automated transaction monitoring system, and inadequate customer due diligence; (b) *The Bank failed to adequately conduct customer due diligence and enhanced due diligence on its foreign correspondent customers, its retail banking customers, and its international personal banking customers and did not properly obtain and analyze information to ascertain the risk and expected activity of particular customers*; (c) The Bank self-reported to the OCC that from 2006 through 2010, the Bank failed to adequately monitor its remote deposit capture/international cash letter instrument processing in connection with foreign correspondent banking; (d) As a result of that inadequate monitoring, the Bank failed to file timely SARs involving remote deposit capture/international cash letter activity in its foreign correspondent banking business; and (e) *The Bank's independent BSA/AML audit function failed to identify systemic deficiencies found by the OCC during the examination process.*

The OCC Consent Order essentially reasserted the requirements of the 2010 Consent Order, though in greater detail, and also mandated certain additional action, including an account/transaction activity "look-back" to determine whether suspicious activity was timely identified and reported.

77.     Since receiving the OCC Consent Order in April 2012, Citigroup has been and continues to be subject to several other regulatory investigations and enforcement actions related to its deficient BSA/AML controls, especially at Banamex and BUSA.   In August 2012, the FDIC/CDBO (formerly the California Department of Financial Institutions) issued Citigroup a consent order that required significant action and extensive changes to correct BSA/AML violations at Banamex USA.   ███████████████████████

███████████████████████████████████████████████████████

████████████████████████████

78.     On March 21, 2013, the FRB issued to Citigroup the FRB Consent Order.   The FRB Consent Order involved overlap with the OCC Consent Order and was largely consistent with the OCC Consent Order, but also required actions in addition to those already required by the OCC Consent Order.   For example, ***the FRB Consent Order more explicitly required significant Citigroup Board oversight related to BSA/AML.   The FRB Consent Order further required the Board take appropriate steps to fully utilize Citigroup financial and managerial resources to ensure compliance***.   The FRB Consent Order also extended the OCC Consent Order to foreign subsidiaries that do business with Citigroup's U.S. business units.

79.     ███████████████████████████████████████

███████████████████████████████████████████████████████

In February 2015, the FDIC/CDBO ████████████████████ found numerous violations of law and deficient BSA/AML controls at BUSA.   The FDIC/CDBO therefore fined BUSA $140 million.   ███████████████████████████████████████

████████████████████████████████████

80.     Other regulatory attention directed at Citigroup's BSA/AML control deficiencies are as follows:

- According to the Company's Annual Report on Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") on March 3, 2014, "Citigroup and Related Parties, including Citigroup's affiliate Banamex USA, have received grand jury subpoenas issued by the United States Attorney's Office for the District of Massachusetts, concerning, among other issues, policies, procedures and activities related to compliance with Bank Secrecy Act and anti-money laundering requirements under applicable federal laws and banking regulations."



- The DOJ's Money Laundering and Bank Integrity Unit recently expanded the scope of its investigation of BUSA to include Banamex following its discovery of suspicious transactions between the two.

    **4.**

81.

██████████   ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████.

82.   ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████   ████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████   ████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████   █████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████   ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████   ██████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

83.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

84.   ███████████████████████████████████████

████████████████████████████████████████████████

███████████████   ████████████████████████████

██████████████████████   ████████████████████████

████████████████████████████████████████████████

████████████████████████   ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████   ████████████████████████████

████████████████████████████████   ██████████████

████████████████████████████████████████████████

██████████████   ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████   ███████████████████

███████████████████████████   ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████



85. ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████ ████████████████████

██████████████████████████████ ██████████████

███████████████████████████████

86. ██████████████████████████████████

██████████████████████████ ███████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████ █████████

████████

87. ██████████████████████████████████

██████████████████████████████████████████

████████████ ████████████████████████████ ███

██████████████████████████████████████ ███

██████████████████████████████████████████



88.

5.

89.

████████████████████████    ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

90.     HSBC is a multinational banking and financial services company headquartered in London, England, and direct competitor of Citigroup.  The circumstances surrounding the HSBC enforcement action are almost identical to the DOJ's ongoing investigation of deficient controls at Banamex/BUSA.  With regard to HSBC, U.S. authorities' probe of lax BSA/AML controls at a U.S. HSBC unit turned up evidence of possible violations at HSBC's Mexican unit.[19] Consequently, the U.S. authorities expanded the scope of their BSA/AML investigation to include HSBC's Mexican unit.  *Id*.  In 2012, HSBC settled that enforcement action by admitting that it failed to maintain effective BSA/AML program in the U.S. and Mexico, including failing to conduct appropriate ████████████████████████████████    ████████████

████████████████    HSBC agreed to pay a penalty of $1.9 billion—a record fine imposed for BSA/AML violations.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████    ████████████████████████

---

[19] *See supra* note 6.

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████

91.   ██████████████████   ████████   ██████   ██████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████   ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████   ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████ █

██████████████████████████████████████████

██████████████████   ██████████████████████

██████████████████████████████████████████

████████ ██ ██████ ██████ ███████ ███████ █████ █████ ███

████████████████





**6.** ███████████████████████████████
███████████

92. ████████████████████████████████
███████████ ███████ ██ ███ ██ ███ ████ ██ █████ ████
████████████████████████████████████
████████████████████ ██████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████

93. ██████████████████████████████
████████████████████████████████████
████ ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████ ███████████████████
████████████████████████████████████
████ ██████████████████████████████████



94.

95.

96. ████████████████████████████████

7.

97. ████████████████████████████████

locations).   Indeed, "on average 90% of BUSA accounts also have a Banamex relationship." CITI-KOGUS-32527.   Accordingly, Citigroup founded BUSA's business model on inherently risky practices (e.g., FCB, MSB, and cross-border transactions with Mexico).

98.   ███████████████████████████████████

██████████████████████████████████████ ████████

███████████████████████████████ ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████ ███

██ ███ ██ █ ██ ████ ███ ████ ██████ ██ ███ ████ █ ███ ████

█████████████████████████

99.   ████████████████████████████████

████████████████ ████████████████████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ ████████████ █████████ ██████████

████████████████████████████████████████████████

████████████████████████████████████████ ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████   As discussed further below, the FDIC/CDBO determined in 2014 that

BUSA still lacked necessary BSA/AML controls and facilitated numerous violations of the BSA/AML over an extended period of time, and therefore fined BUSA $140 million.   The regulatory findings and fine were easily preventable had the Board ensured Citigroup took action to implement effective oversight controls at BUSA ████████████████████████████████

██████████████████

> **8.      The Board Had Ample Warning of and Time to Correct Ongoing BSA/AML Deficiencies at BUSA and Avoid Monetary Penalties**

100.   ████████████████████████████████████████████████

████████ ████████ ██ ██████ ████████ ██████ ████████ ████ ██ ████████ The Board therefore caused or allowed BSA/AML violations at BUSA and noncompliance with the Consent Orders for an extended period of time.

101.   To begin with, the OCC and FRB's Consent Orders ████████████████ ████████████ called the Board's attention to other deficient controls legally required by the BSA/AML and essential to preventing, detecting, and reporting suspicious activity and BSA/AML violations at Citigroup, Citibank, and BUSA.   For example, the OCC and FRB Consent Orders required Citigroup (and specifically Citibank and BUSA) to implement effective controls over customer identification, know KYC (i.e., CDD), EDD for high-risk customers, screening for OFAC sanctions ("sanctions screening"), which are critical to preventing BSA/AML violations. ████████████████████████████████████

██████████████████████████████████████████████

████████████████████   The OCC and FRB Consent Orders also required effective transaction monitoring controls which are essential to detecting suspicious activity and BSA/AML violations, and without which reporting of all suspicious activity and BSA/AML

violations, as required by the BSA/AML, is not possible. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

102.   ██████████████████████████████████████████████

████████████████████████████████   ████████████████████████

██████████   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████   ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████   ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████   ████████████████   ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

103. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ ███████████ █████████ ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ██████████████ ███████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

104. ██████████████████████████████████

███████████████████████████████████████████, BUSA entered into the FDIC/CDBO

Consent Order with the FDIC/CDBO, only a few months after Citigroup received the OCC

Consent Order.  ██  The FDIC/CDBO ordered BUSA's board of directors to increase their

oversight of BUSA and "develop, adopt, and implement an updated written [BSA/AML]

compliance program" as required by the BSA.  The FDIC/CDBO Consent Order implicated very

similar issues also underlying the OCC Consent Order.  Specifically, it required BUSA, within ninety days, develop, adopt, and implement a BSA/AML compliance program that, at minimum:

- establishes a system of internal controls to ensure compliance with the BSA, including suspicious activity monitoring and detection;

- provides for independent testing of compliance with the BSA and OFAC and the efficacy of BUSA's corresponding compliance programs, including (without limitation), BSA/AML risk assessment, reporting and recordkeeping, CIP implementation, adequate CDD, transaction testing that ***emphasizes high-risk operations and geographies***, adequate and comprehensive training, and effective management information system;

- allocates staffing and resources commensurate with BUSA's risk profile;

- provides for adequate training regarding BSA/AML compliance; and

- designates a qualified BSA Compliance Officer to oversee the program and ensure compliance.

105.    The FDIC/CDBO Consent Order also detailed and set deadlines for the specific internal controls that the FDIC/CDBO mandated BUSA develop, adopt, and implement, including: (i) a written OFAC risk assessment policy within thirty days; (ii) written BSA/AML policies and procedures with respect to FCB including EDD; (iii) revised written risk-based CDD program, including High Risk Account Classification ("HRAC") identification, within sixty days; (iv) revised written policies and procedures with respect to BSA monitoring and SARs within ninety days; (v) "revised written procedures to comprehensively capture wire transfer activity and monitor such activity for potentially suspicious or unusual activity" within ninety days; and (vi) "develop an acceptable plan to retroactively review wire transfer reports to capture transactions

between $10,000 and $50,000 for the past 12 months and file SARs, as warranted" within forty-five days.  Yet, for well over two years, BUSA failed implement the minimum BSA/AML compliance program required by law and the FDIC/CDBO Consent Order.

106.



107.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████     ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

108.   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████   ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████   █████

██████████   ██████████████████████████████████

███████████████████████████████████████████████

██████████████████████

109.   ████████████████████████████████████

█████████████████████████████████   ██████████

███████████████████████████████████████████████

█████████████████

110. 

111.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

- ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████    ██████████████████████████████████

███████  ████  ██  ████  ████████  ██████  ████  ███████

████████████████████████████████████████████████████

████████████████████████████████████████████

- ████████████████████████████████████████████████

█████████████████████    █████████████  █████████████

████████████████████████████████████████████████████

████████████████████████████████

- ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  ████████████████  ████████

████████████████████████████████████████████████████

███████████████████████████

- ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████



112.    Consequently, on July 22, 2015, the FDIC/CDBO fined BUSA $140 million based

on their determination that:

> [T]he bank failed to implement an effective BSA/AML Compliance Program over
> an extended period of time. The institution failed to retain a qualified and
> knowledgeable BSA officer and sufficient staff, maintain adequate internal
> controls reasonably designed to detect and report illicit financial transactions and
> other suspicious activities, provide sufficient BSA training, and conduct effective
> independent testing.[23]

113.    While the FDIC/CDBO is not requiring it, Citigroup will continue closing its

remaining BUSA branches and winding down operations throughout the course of the year.

Citigroup's decision to close BUSA in its entirety rather than bring it into compliance with

BSA/AML suggests that BUSA was only worthwhile to Citigroup as a noncompliant bank—

---

[23] *See supra* note 5.

further indication that Citigroup's Board purposefully or knowingly caused or allowed BUSA to violate BSA/AML.

114.    The DOJ's investigation of BUSA has also "uncovered potential violations serious enough to merit a fine under the [BSA/AML]."[24]   Included in the DOJ's findings are e-mails raising concerns about lax BSA/AML practices, poor CDD, insufficient resources, and nonresponsive management.  *Id*.  The Boston U.S. Attorney's Office's investigation of BUSA is also ongoing.[25]

**9.**   ██████████████████████████████████
         ██████████████████████████████████
         █████████████████

115███  ███████████████████████████████████

██████████████████████████████████████████

████████████████    █████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████    ██████████████████████████

██████████████    ███████████████████████████

██████████████████████████████████████████

███████████████████████    ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[24] *See* Alan Katz, et al., *Citigroup Said to Ignore E-mails on Lax Controls at Banamex Unit*, Bloomberg, June 16, 2015, http://www.bloomberg.com/news/articles/2015-06-16/citigroup-said-to-ignore-e-mails-on-lax-controls-at-banamex-unit.

[25] *See supra* note 24.

operates.   Even when Citigroup finally began implementation in Mexico, the Board failed to
ensure Citigroup effectively designed and executed those critical BSA/AML controls.

116.   ███████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████   ███████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████

117.   ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████

118.   ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████   ██████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████    ███████████████████████   ████████████████

███████████████████████████████████████████████

██████████████████████████████████████   █████████████████

███████████████████████████████████████████████

██████████████████████████████████

119.  ████████████████████████████████████████

███████████████████████████████████████████████

████████████████   ██████████████████   ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████   █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████   ████████

███████████████████████████████████████████████

████████████████████████████

120.  ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

121.

122.

123.



124.

██████████████████████████████████████████████████

████████████████

125.   ███████████████████████████████████████

███████████████████████████████████████  ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  █████████████████████

██████████████████████████  ███████████████████████

█████████████████████████████████████████  ████████

██████████████████████████████████████████████████

████████████████

126.   ███████████████████████████████████████

████████████████████████  ██████████████  ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

██████  ███████████████████████████████

███████████████████████████████  ██████████

████████████████████████████  █████████████

████████████████

127. ███████████████████████████████

███████████████████████████████████

████████  ████████████  █████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████  ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████

128. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████   ███████████████████████

████████████████████████████████

129.   ██████████████████████████████

███████████████████████████████████████████

████████   ██████████████████████████

████████  ███  ████████  ██████  █████  ██  ███  ███  ██  ████

███████████████████████████████████████████

███████████████████████████████████████████

████████████   █████████████████████████

███████████████████████████████████████████

███████  █████  ███████████   █████████████

███████████████████   ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

-77-

130. ████████████████████████████████████
████████████████████████  ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████  ████████████████████████
██████████  ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

131. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████  ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████   ████████████████████████

██████████████████████████   ████████████████████████

████████████████████████████   ██████████████████████

██████████████████████████████████

C.     **Frauds Exploit Individual Defendants' Failure to Ensure Effective Risk Management, Financial Reporting, and Legal Compliance Controls at Banamex Despite Ample Warning**

132.     █████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████.  The Individual Defendants nonetheless failed to implement effective controls at Banamex, including controls over legal compliance, risk management, and financial reporting.  ███████████████████████████████████

██████████████, the Company could have avoided (or at least mitigated) a $400 million fraud disclosed by Citigroup in the first fiscal quarter of 2014.

1.     **Increased Fraud Trend Alerts Board to Ineffective Controls at Banamex**

133.     Over the past several years, the Individual Defendants received numerous warnings of the ineffectiveness of controls at Banamex. By that time, Citigroup already had extensive experience with fraud in the LATAM region.  According to media reports, "[i]n the 1980s, [Citigroup] was crippled by bad loans in the [LATAM (including Mexico)] region."[27]  The

---

[27] *See supra* note 21.

████████████████████████████████████████████████████

██████████████████████████████████

134. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████   ████████████

█████████████████████████████████   █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

135. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████   █████████████   ████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

136. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████   █████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

137. ██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████ ████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████ █ ██████████████
██████████████████████████████████████████████
████████████████████████████ ██████████████████████
████████████████████████████████████

138. ██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████ ████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████ ██████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████ ████████████████████████
████████████████████████ ████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████

139. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

140. ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

141. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

142. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ ██████████████
████████████████████████████████████████████████████
████████████████████████ ████████████████ ██████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

143. ████████████████████████████████████████████
████████████████████████████████████ ██████████████
████████████████████████████████████████████████████
████████████████████████████ ████████████████ ██████
████████████████████████████████████████████████████



144.    On October 14, 2014, Citigroup announced that an investigation uncovered illegal conduct, including another fraud in the range of about $15 million.  Specifically, that press release explained:

> In July, we directed an outside law firm to conduct an independent investigation into the activities of a legacy Banamex unit that provided personal security services in Mexico. The investigation included in-depth interviews, the extensive review of electronic and paper files, and forensic analysis of computers and electronic media. The investigation uncovered illegal conduct, including fraud in the range of US $15 million, the unauthorized providing of security services to outside parties, and the use of intercepted telecommunications. The unit is being disbanded and security services will be provided by Citi's global security Function. We have also notified and are cooperating with law enforcement and regulators regarding this matter in the U.S. and Mexico.

### 2.    $400 Million OSA Fraud Exploits Banamex's Inadequate Controls

145.    On February 28, 2014, Citigroup issued a press release announcing that the Company was forced to adjust its fourth quarter and full year 2013 financial results downward by an estimated $360 million pretax ($235 million after-tax) as a result of a fraud discovered at Banamex.  The fraud case from Banamex's relationship with Oceanografia S.A. de C.V. ("OSA"),

a Mexican oil services company with close ties to Mexico's state-owned oil company, Petróleos

Mexicanos ("Pemex").  The press release explained:

> As of December 31, 2013, Citi, through Banco Nacional de Mexico ("Banamex"), had extended approximately $585 million of short-term credit to Oceanografia S.A. de C.V. ("OSA"), a Mexican oil services company, through an accounts receivable financing program. [(The "OSA Fraud")] OSA has been a key supplier to Petróleos Mexicanos ("Pemex"), the Mexican state-owned oil company. Pursuant to the program, Banamex extended credit to OSA to finance accounts receivables due from Pemex. As of December 31, 2013, Banamex also had approximately $33 million in either outstanding loans made directly to OSA or standby letters of credit issued on OSA's behalf.
>
> On February 11, 2014, Citi learned that OSA had been suspended from being awarded new Mexican government contracts. Upon learning of this suspension, Citi, together with Pemex, commenced detailed reviews of their credit exposure to OSA and of the accounts receivable financing program over the past several years. As a consequence of these reviews, on February 20, 2014, Pemex asserted that a significant portion of the accounts receivables recorded by Banamex in connection with the Pemex accounts receivable financing program were fraudulent and that the valid receivables were substantially less than the $585 million referenced above.
>
> Based on Citi's review, which included documentation provided by Pemex, Citi estimates that it is able to support the validity of approximately $185 million of the $585 million of accounts receivables owed to Banamex by Pemex as of December 31, 2013.  This $185 million consists of approximately $75 million supported by documentation in Pemex records and approximately $110 million of documented work performed that was still going through the Pemex approval process.  The difference of an estimated $400 million has been charged to operating expense in Transaction Services in the fourth quarter of 2013, with an offset to compensation expense of approximately $40 million associated with the Banamex variable compensation plan.
>
> \* \* \*
>
> Based on its continuing review, Citi will determine whether all or any portion of the $33 million of direct loans made to OSA and the remaining approximately $185 million of accounts receivable due from Pemex is impaired.

146.   Citigroup also disclosed further losses and investigations by U.S. and Mexican regulators resulting from the OSA Fraud.   The Mexican National Banking and Securities Commission (the "CNBV") had already found potentially criminal action related to the OSA Fraud.[29]   In its Quarterly Report on Form 10-Q filed with the SEC on May 2, 2014, Citigroup disclosed:

> During the first quarter of 2014, Citigroup incurred approximately $165 million of incremental credit costs related to the Pemex supplier program. The vast majority of the credit costs were associated with Citigroup's $33 million of direct exposure to OSA as of December 31, 2013 and uncertainty about Pemex's obligation to pay Citigroup for a portion of the accounts receivable Citigroup validated with Pemex as of year-end 2013 (approximately $113 million). The remaining incremental credit costs were associated with an additional supplier to Pemex within the Pemex supplier program that was found to have similar issues.

> In the United States, the SEC *has commenced a formal investigation* **and the** ***Department of Justice has requested information*** regarding Banamex's dealings with OSA. In Mexico, the ***Mexican National Banking and Securities Commission has commenced an in situ extraordinary review.***

Citigroup further disclosed, in its Quarterly Report on Form 10-Q filed with the SEC on October 30, 2014, that the CNBV issued a corrective action order that must be implemented at Banamex and ***fined Banamex approximately $2.2 million***.   The Federal Bureau of Investigation and United States Attorney's office in Manhattan are also investigating the OSA Fraud, including potential institutional control failures.[30]

147.   In yet another example of the Company's indifference to regulatory mandates, Banamex failed to comply with the CNBV's corrective action order.   In its Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015, the Company announced that the CNBV

---

[29] *See* Amy Guthrie, *Mexican Regulator Fines Citigroup's Banamex over Alleged Fraud*, Wall St. Journal, Oct. 15, 2014, http://www.wsj.com/articles/mexican-regulator-fines-citigroups-banamex-over-alleged-fraud-1413419224.

[30] *See* Nathaniel Parish Flannery, *Why Is the FBI Scrutinizing Citigroup's Operations in Mexico?*, Forbes, Apr. 3, 2014, http://www.forbes.com/sites/nathanielparishflannery/2014/04/03/why-is-the-fbi-scrutinizing-citigroups-operations-in-mexico/.

imposed an additional fine of $90,000 against Banamex due to its noncompliance.  Most recently, in its Current Report on Form 8-K, filed with the SEC on May 28, 2015, the Company disclosed that "the CNBV continues to review Banamex's compliance with the corrective action order" and "has initiated *a formal process to impose additional fines* on Banamex with respect to the manner in which OSA's debt was recorded by Banamex."

### 3.    The OSA Fraud Implicates Additional Control Failures at Banamex

148.    According to media reports, "Citigroup was looking to boost its lending in Mexico, and specifically in the oil-and-gas sector" in or around 2011.[31]  Consequently, changes were made to Banamex's model for extending credit to OSA which allowed more accommodations.  *Id.*  Under the new model, Banamex began accepting work orders as proof of payment, rather than invoices, and did not otherwise corroborate the work order with Pemex.  *Id.* ███████████

██████████████████████████    The new model permitted OSA to falsify work orders to represent that Pemex had approved them.  Due to control failures, Banamex was none-the-wiser.  ████████████████████████████████████

██████████████████████████████████████████

█████████████████████████  ████████████  ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

149.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[31] *See* Amy Guthrie, et al., *How Citi Stumbled in Mexico*, Wall St. Journal, May 14, 2014, http://www.wsj.com/articles/citigroup-fires-more-over-oceanografia-fraud-1400076082.

███████████████████████████████████████████

███████████████████████████████

150.    The OSA perpetrated its fraud against Banamex for years even though the fraud involved a simple accounts receivable growing to $585 million.   In contrast to the OSA receivables, the average turnaround time of an accounts receivable in the oil-services industry is only about three months.[32]

151.    Given the irregularity of the OSA receivables, even a cursory audit of the OSA program should have brought the fraud to light sooner and mitigated losses.   █████████

███████████████████████████████████████████

██████   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████   ████

█████████████

152.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[32] *See supra* note 21.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

153.   In fact, the OSA Fraud even further implicates Banamex's deficient BSA/AML controls.  OSA was a well-known, high-risk company to do business with and "d[id] not have a track record of treating bondholders very well."[33]  *The Wall Street Journal* reports that, "[l]ong before Banamex ramped up its lending to [OSA], several other major banks had cut or reduced ties to the company over concerns about the health of its business.[34]  Further, in 2008 and 2009, U.S. ratings firms "warned about [OSA's] high leverage and poor cash flow generation" as well as investigations of potentially "improper deals between Oceanografía and Pemex."[35]

154.   Due diligence required by the BSA/AML was not performed in connection with the fraudulent OSA loans.  Had Citigroup taken this step, it would have discovered OSA's poor credit history and Banamex would not have made the loans (or at least required additional assurances).  For example, had certain KYC/CDD/EDD controls necessary to ensure compliance with AML been effectively implemented at Banamex, the OSA Fraud would have been prevented or mitigated.  Moreover, given OSA's relationship with the Mexican government,[36] had HRAC and SPF/PEP controls been effectively implemented at Banamex, OSA would have been identified as a high-risk client.  ██████████████████████████

---

[33] *See supra* note 21.

[34] *See supra* note 31; *see also supra* note 21 (reporting that OSA is "well known among Mexican investors and politically connected but financially shaky").

[35] *See supra* note 21.

[36] OSA "derives nearly all of its business from Pemex, Mexico's government-owned oil monopoly." *See supra* note 21.  Moreover, "the rapid growth of Oceanografía and other well-connected local contractors has raised concerns about the cozy relationship between the government oil monopoly and its long-term suppliers." *Id.*



155.

## VI. THE DIRECTOR DEFENDANTS CAMPAIGN FOR RETENTION WHILE WITHHOLDING MATERIAL INFORMATION FROM STOCKHOLDERS.

156.    On March 14, 2013, Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, and Joss caused Citigroup to issue a false and misleading Proxy Statement in connection with the 2013 Annual Stockholders meeting that was held on April 24, 2013 (the "March 2013 Proxy").  The March 2013 Proxy asked Citigroup's stockholders to vote on the election of the eleven nominees for the Board listed in the proxy,

---

[37] *See supra* note 21.

including Director Defendants Corbat, Humer, Joss, O'Neill, Rodin, Ryan, Santomero, Spero, Taylor, Thompson, and Zedillo.

157.    In violation of section 14(a) of the Exchange Act, the March 2013 Proxy contained false and misleading statements and omissions.

158.    On page 24, the March 2013 Proxy misleadingly represented that Citigroup's Board selected nominees for the Board:

> [H]ave the qualifications and experience to approve and guide Citi's strategy and to oversee management's execution of that strategic vision. Citi's Board of Directors consists of individuals with the skills, experience and backgrounds necessary to oversee Citi's efforts toward continued growth and profitability ***while mitigating risk and operating within a complex financial and regulatory environment.***
>
> The nominees listed below are leaders in business, the financial community and academia because of their intellectual acumen and analytic skills, strategic vision, their ability to lead and inspire others to work with them, and their records of outstanding accomplishments over a period of decades. Each has been chosen to stand for election in part because of ***his or her ability and willingness to ask difficult questions, understand Citi's unique challenges and evaluate the strategies proposed by management, as well as their implementation.***
>
> Each of the nominees has a ***long record of professional integrity, a dedication to his or her profession and community, a strong work ethic that includes coming fully prepared to meetings and being willing to spend the time and effort needed to fulfill professional obligations, the ability to maintain a collegial environment, and the experience of having served as a Board member of a sophisticated global company.***

159.    This statement was false and misleading because the Director Defendants lacked the "experience and backgrounds necessary to oversee Citi's efforts toward continued growth and profitability while mitigating risk and operating within a complex financial and regulatory environment," "ability and willingness to ask difficult questions, understand Citi's unique challenges and evaluate the strategies proposed by management, as well as their implementation," "professional integrity," "dedication," and "strong work ethic."  This is evidenced by the fact that the Director Defendants knew about, but failed to remediate regulators' finding that Citigroup's

BSA/AML program did not comply with applicable law, particularly at BUSA, ████████

██████████████████████████████████████████

████████████████████     ████████████████████

██████████████████████████████████████████

████████████████

160.   The March 2013 Proxy misleadingly represented that Citigroup's Board was actively working to ensure Citigroup's compliance with applicable law and best governance practices, including risk management practices, stating:

(a) "Citi continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency *and maintaining full compliance with the laws, rules and regulations that govern Citi's businesses*. Citi is *active in ensuring its governance practices are at the leading edge of best practices*."

(b) "Citi's Corporate Governance Guidelines embody many of our longstanding practices, policies and procedures, which are the foundation of *our commitment to best practices.* The Guidelines are reviewed at least annually, and revised as necessary, to continue to reflect best practices. The full text of the Guidelines, as approved by the Board, is set forth on Citi's website. The Guidelines outline the responsibilities, operations, qualifications and composition of the Board."

(c) "The Board of Directors has adopted a Code of Conduct, which provides an overview of the laws, regulations and Citi policies and procedures applicable to the activities of Citi, and sets forth the standards of ethics and professional behavior expected of employees and representatives of Citi. *The Code of Conduct applies to every Director, officer and employee of Citi and its consolidated subsidiaries. All Citi employees, directors and officers are required to read and comply with the Code of Conduct….*"

(d) "*Directors have full and free access to senior management and other employees of Citi.* New Directors are provided with an orientation program to familiarize them with Citi's businesses and its legal, compliance, regulatory and risk profile. Citi provides educational sessions on a variety of topics, which all members of the Board are invited to attend. These sessions are designed to allow Directors to, for example, develop a deeper understanding of a business issue or a complex financial product."

(e) "*The Board oversees Citi's global risk management framework*. At each regularly scheduled Board meeting, the Risk Management and Finance Committee of the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Global Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to identify, assess and manage risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort. The Risk Management and Finance Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies. *The Committee's responsibilities include reviewing risk management and compliance policies and programs for, and reports on, Citi and its subsidiaries*."

(f) "The ***Risk Management and Finance Committee***, which has the ***primary responsibility*** for (1) ***oversight of Citigroup's risk management framework***, including the significant policies and practices used in managing credit, market, operational and certain other risks and (2) oversight of Citigroup's policies and practices relating to Treasury matters, including capital, liquidity and financing, as well as to merger, acquisition, and divestiture activity (M&A). The Committee reports to the Board regarding Citigroup's risk profile, as well as its risk management framework, including the significant policies and practices employed to manage risks in Citigroup's businesses, as well as the overall adequacy of the Risk Management function. The Committee's role is one of oversight, recognizing that management is responsible for executing Citigroup's risk management, Treasury and M&A policies."

(g) "The ***Audit Committee***, which assists the Board in fulfilling its ***oversight responsibility*** relating to (i) the integrity of Citi's consolidated financial statements and financial reporting process and Citi's systems of internal accounting and financial controls; (ii) the ***performance of the internal audit function***; (iii) the annual independent integrated audit of Citi's consolidated financial statements and effectiveness of Citi's internal control over financial reporting, the engagement of the independent registered public accounting firm and the evaluation of the Independent Auditors' qualifications, independence and performance; (iv) ***policy standards and guidelines for risk assessment and risk management***; (v) the ***compliance by Citi with legal and regulatory requirements***, including Citi's disclosure controls and procedures; and (vi) the fulfillment of the other responsibilities set out in its charter, as adopted by the Board…."

(h) "***Risk Management: Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. Directors provide oversight of the Company's risk management framework, including the significant policies, procedures and practices*** used in managing credit, market and certain other risks and review recommendations by

management regarding risk mitigation. Citi's Board must include members with risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk."

"***Regulatory Compliance: Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies***, both domestically and internationally, ***including the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation***, the Consumer Financial Protection Bureau, state banking and insurance departments, and international financial services authorities. ***Having Directors with experience serving at, or interacting with, regulators, or operating businesses subject to extensive regulation, is important to furthering Citi's continued compliance with its many regulatory requirements and fostering ongoing productive relationships with its regulators***."

"***Corporate Governance: Citi aspires to the highest standards of corporate governance and ethical conduct***: doing what we say, reporting results with accuracy and transparency, and ***maintaining compliance with the laws, rules and regulations that govern the Company's businesses***. ***The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines***. To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues and the impact that governance policies have on the functioning of a company."

(i) "***Risks to Be a Primary Consideration: Citi fully appreciates its responsibility to assume risks which are prudent and well understood, and to effectively manage those risks to protect the franchise***. We have adopted numerous features of our incentive compensation programs to reduce the potential for imprudent risk-taking that may undermine our business objectives."

"The Chief Risk Officer meets twice per year with the Committee to review risk levels and trends across the firm, as well as incentive compensation frameworks at the senior executive level and throughout the firm."

"Our current general annual performance evaluation process also explicitly takes risk into account in a number of ways, and will continue to be applicable in 2013 broadly throughout Citi. The performance evaluation system generally includes a risk behavior goal for all employees…."

(j) "In awarding incentive compensation to the named executive officers and other senior executives for 2012, the Committee took into account Citi's financial results and the progress made against Citi's strategic priorities. Performance for 2012 for Citi included the following strengths and areas for improvement….

- During 2012, Citi continued to build on the significant transformation of the firm that has occurred over the last several years. Despite a challenging operating environment, Citi's 2012 results showed ongoing momentum in most of our core businesses, as we continued to simplify our business model and focus resources on our core Citicorp franchise while continuing to wind down Citi Holdings.

- Citi's strategy is built upon our position as a leading global bank for both institutions and individuals. With this long-term strategy in mind, in December 2012, Citi announced a number of repositioning efforts to optimize our footprint, resize and re-align certain businesses and improve efficiencies, while at the same time maintaining our unique competitive advantages."

161.    These statements were false and misleading because the Board was not working to ensure Citigroup's compliance with BSA/AML requirements. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████    Yet, the Director Defendants' failed to act ███████████████ to

comply with BSA/AML requirements, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

162.    The March 2013 Proxy misleadingly represented that Officer Defendants Corbat, McQuade, and Medina-Mora had made strong progress on strengthening Citigroup controls.   In regard to Corbat's individual performance, the March 2013 Proxy misleadingly represented that "progress was made on key regional initiatives, such as improved controls and regulatory ratings."

This statement was false and misleading, ███████████████████████

████████████████████████████████████████████████████████

███   In regard to defendant McQuade's individual performance, the March 2013 Proxy misleadingly represented that defendant McQuade's "[k]ey 2012 accomplishments included … Ensuring strong governance of Citibank, N.A. consistent with what is expected from our regulators in the U.S. and around the world, including regulators in Japan, by providing clear communications and driving change to address regulators' concerns … Implementing controls and governance frameworks that enhance the safety and soundness of Citibank, N.A…." ██████ ███████ were false and misleading ██████████████████████ ██████████████████████████████████ In regard to defendant Medina-Mora's individual performance, the March 2013 Proxy misleadingly represented that "Global Consumer Banking showed strong results on key risk metrics and strong quality controls were implemented across the Consumer businesses."  This statement was false and misleading ████████████████████████████████ ████████████████████████████████

163.   The foregoing false and misleading statements were an essential link in the election of the Director Defendants to the Board of Citigroup and say-on-pay as it applied to Officer Defendants Corbat, McQuade, and Medina-Mora.  The March 2013 Proxy harmed Citigroup by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Director Defendants continued to harm Citigroup by their ongoing failure to correct Citigroup's BSA/AML violations and control deficiencies, and by continuing to pay themselves exorbitant amounts of compensation that were unwarranted in light of their

extensive wrongdoing, including compensation to Officer Defendants Corbat, McQuade, and Medina-Mora, totaling $12,377,508, $9,699,159, and $7,185,481, respectively, in 2012.

164.    On March 12, 2014, Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, Hennes, Ryan, and Joss caused Citigroup to issue a false and misleading Proxy Statement in connection with the 2014 Annual Stockholders meeting that was held on April 22, 2014 (the "March 2014 Proxy").  The March 2014 Proxy asked Citigroup's stockholders to vote on the election of the fourteen nominees for the Board listed in the proxy, including Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, Hennes, Ryan, and McQuade, and sought the approval of the 2014 Equity Compensation Plan.

165.    In violation of section 14(a) of the Exchange Act, the March 2014 Proxy contained false and misleading statements and omissions.

166.    Page 24 of the March 2014 Proxy made substantially the same misleading representations as alleged in ¶160 above.  These statements were false and misleading for the same reasons alleged in ¶161 above.

167.    The March 2014 Proxy also misleadingly represented that Citigroup's Board was actively working to ensure Citigroup's compliance with applicable law and best governance practices, including risk management practices, making substantially the same statements alleged in sections (a)-(j) in ¶160 above.[38]  These statements were false and misleading because ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[38]  The March 2014 Proxy made substantially the same statements alleged in sections (a)-(j) of ¶160 above, on pages 7-9, 13, 15, 20, 25, and 50, respectively.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██ ████ ████ ██ ██ ████ ██ ████ ████ ████ ██ ████ ████

███████████████████████████████████████

███████████████████████████████████████

██████████████

168.   The March 2014 Proxy misleadingly represented that Officer Defendants Corbat and Medina-Mora had made strong progress on strengthening Citigroup controls.  In regard to defendant Corbat's individual performance, the March 2014 Proxy misleadingly represented that defendant Corbat was responsible for "Strong risk and controls management" and that he "significantly accelerated the Company's initiatives to improve risk outcomes and controls, although additional work remains to be done.  [Defendant Corbat] made important efforts to establish forward progress with our regulators, resulting in 'no objection' to Citi's 2013 [Comprehensive Capital Analysis and Review ("CCAR")] submission."██████████████ ██ this statement was false and misleading ████████████████████

███████████████████████████████████ In addition, this statement was false and misleading ████████████████████

██████ ██ ████ ██ ████ ████ ████ ██████ ████ ████

███████████████████████████████   In regard to defendant Medina-Mora's individual performance, the March 2014 Proxy misleadingly represented that he was responsible for "[s]trong risk and controls management."  It also stated:

> Although **strong remediation measures are under way**, the incentive award reflects consideration of leadership accountability for disclosed control issues that were identified in 2013, including in Banamex USA. Roll out unified global customer platform and drive other operating efficiencies.  Mr**. Medina-Mora drove GCB's progress on the multiyear rollout of a common global technology platform**.  Mr. Medina-Mora helped create organizational efficiencies by integrating the Operations and Technology group supporting GCB into the businesses, although more work remains to be done to complete the integration.

169.    This statement was false and misleading because, ████████████████



170.    The foregoing false and misleading statements were an essential link in the election of the Director Defendants to the Board of Citigroup and say-on-pay as it applied to Officer Defendants Corbat and Medina-Mora.  The March 2014 Proxy harmed Citigroup by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Director Defendants continued to harm Citigroup by their ongoing failure to correct Citigroup's BSA/AML violations and control deficiencies, and by continuing to pay themselves exorbitant amounts of compensation that were unwarranted in light of their extensive wrongdoing, including compensation to Officer Defendants Corbat and Medina-Mora, totaling $17,558,119 and $13,992,433, respectively, in 2013.

171.    On March 18, 2015, Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, Hennes, and Ryan caused Citigroup to issue a false and misleading Proxy Statement in connection with the 2015 Annual Stockholders meeting that was held on April 28, 2015 (the "March 2015 Proxy"), at which Citigroup's stockholders were to vote on the election of the thirteen nominees for the Board listed in the proxy, including Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, and Hennes.

172.    In violation of section 14(a) of the Exchange Act, the March 2015 Proxy contained false and misleading statements and omissions.

173.    Page 28 of the March 2015 Proxy made substantially the same misleading representations as alleged in ¶160 above.  These statements were false and misleading for the same reasons alleged in ¶161 above.

174.    The March 2015 Proxy also misleadingly represented that Citigroup's Board was actively working to ensure Citigroup's compliance with applicable law and best governance practices, including risk management practices, making substantially the same statements alleged in sections (a)-(j) of ¶160 above.  These statements were false and misleading because ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

175.    The March 2015 Proxy misleadingly represented that Officer Defendants Corbat, Leach, and Medina-Mora had made strong progress on strengthening Citigroup controls.   In regard to defendant Corbat's individual performance, the March 2015 Proxy misleadingly represented that defendant Corbat "sponsored our multi-year focus on Ethics and Culture, our broad and innovative effort to further heighten attention towards ethical decision making across Citi," was responsible for "[s]trong risk and controls management," and "provided oversight and leadership of Citi's comprehensive responses to legal and regulatory developments or control issues (including those involving the foreign exchange business and Citi's franchise in Mexico), bringing urgency to remediation efforts and holding executives and managers accountable throughout Citi, where appropriate.  However, the Committee also considered those developments when it reduced Mr. Corbat's pay for 2014."  This statement was false and misleading because

███████████████████████████████████████████████

████████████████████████████     ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████     ██████████████████████████████████

███████████████████████ In regard to defendant Leach's individual performance, the March 2015 Proxy misleadingly represented:

> Regulatory expectations: Mr. Leach drove the completion of numerous complex projects and systems implementations as part of the ongoing maintenance of our risk and control environment. ***As an example, Citi consolidated 14 legacy anti-money-laundering monitoring systems into a single unified platform***. In addition, Franchise Risk and Strategy drove a significant component of our Ethics and Culture initiative, which is our effort to further heighten attention towards ethical decision-making across Citi; the initiative includes a globally consistent approach to ethics training. Franchise Risk and Strategy also sponsored global standards for suitability and sales practices.

> ***Strong risk and controls management***: Mr. Leach, together with Mr. Gerspach, had a management role in the 2014 CCAR submission that resulted in a regulatory objection; Mr. Leach also actively participated in the subsequent overhaul of the capital planning process. That effort included a significant increase in the permanent resources devoted to the capital plan, including strategic technology buildouts, in areas led by Mr. Leach. Franchise Risk and Strategy has continued to develop or participate in innovative programs to address emerging risks, ***such as our global focus on risks related to employee conduct.*** Mr. Leach led a ***renewed focus on identifying and managing country-specific risks,*** preventing a range of potential losses, among other significant initiatives to mitigate risk.

> \* \* \*

> Drive additional efficiencies in risk management throughout Citi: Working with the Board's Audit Committee, ***Mr. Leach is facilitating the global transformation of our Internal Audit function***, including through championing enhanced technologies dedicated to that function. Mr. Leach led the drive to reduce the number of legal vehicles worldwide, thereby simplifying Citi's organizational structure and reducing governance risks.

These statements were false and misleading because, ███ █████████ ██████████ ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ In regard to defendant Medina-

Mora's individual performance, the March 2015 Proxy misleadingly represented that he was responsible for "[s]trong risk and controls management."  It continued:

> In awarding incentive compensation to Mr. Medina-Mora, the **Committee recognized both his role in Mexico during the period that included disclosed control issues in the region, as well as his active participation in Citi's comprehensive and decisive response** which included significant turnover in Banamex management and governance changes at the Banamex Board level. At GCB, he led broad-based efforts to further strengthen the control environment through our cultural initiative known as the Power of One, among other efforts. Operational risk losses at GCB declined in frequency and size during 2014, and GCB's Risk Appetite Ratio remained over 100% for 2014. Net credit loss metrics improved over 2013 and as compared to plan.
>
> Roll out unified global customer platform and grow digital channels: Mr. Medina-Mora continued to drive progress on the multi-year rollout of a common global technology platform, as measured by the number of accounts on our common global version. Under Mr. Medina-Mora's leadership, GCB significantly advanced the scope and quality of its digital platforms globally, as measured by the number of individual users and the number of countries in which the full platform is available.

These statements are false and misleading for the same reasons the March 2015 Proxy's statements about defendants Corbat and Leach were misleading, ████████████

████████████████████████████████████████████████████████████████████████

████████████

176.   The foregoing false and misleading statements were an essential link in the election of the Director Defendants to the Board of Citigroup and say-on-pay as it applied to Officer Defendants Corbat, Leach, and Medina-Mora.  The March 2015 Proxy harmed Citigroup by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  For example, as a result of their election to the Board, the Director Defendants continued to harm Citigroup by their ongoing failure to correct Citigroup's BSA/AML violations and control deficiencies, and by continuing to pay themselves exorbitant amounts of compensation that were unwarranted in light of their extensive

wrongdoing, including compensation to Officer Defendants Corbat, Leach, and Medina-Mora totaling $14,457,199, $13,025,377, and $13,025,377, respectively, in 2014.

177.   Without access to Citigroup's internal documents, it was impossible for Citigroup's stockholders to know that the Director Defendants issued false and misleading statements in the March 2013-2015 Proxies. ███████████████████████████

███████████████████████████████

## VII.   DAMAGES TO CITIGROUP

178.   As a result of the Individual Defendants' improprieties, Citigroup violated anti-money laundering law and regulation and suffered fraud loss.  These violations and losses have caused Citigroup to incur substantial damages, including reputational damages.  Citigroup's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

179.   As a direct and proximate result of the Individual Defendants' actions, Citigroup has also expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from paying any fines, penalties, or settlements with U.S. and Mexican regulators and other government agencies pertaining to Banamex or BUSA;

(b)   costs incurred from any and all regulatory inquiries and investigations pertaining to Banamex and BUSA;

(c)   costs incurred from internal investigations of Banamex and BUSA;

(d)   costs incurred from revamping its deficient controls at Banamex and BUSA;

(e)      costs incurred from redoing previous remediation as required by the Consent Orders or the BSA/AML;

(f)      costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Citigroup; and

(g)      costs incurred from issuing the false and misleading March 2013-2015 Proxies.

180.    Further, as a direct and proximate result of Individual Defendants' failure to ensure adequate controls at Banamex, Citigroup has suffered substantial monetary loss as the result of frauds perpetrated at Banamex.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

181.    Plaintiffs bring this action derivatively in the right and for the benefit of Citigroup to redress injuries suffered, and to be suffered, by Citigroup as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Citigroup is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.    Plaintiffs will adequately and fairly represent the interests of Citigroup in enforcing and prosecuting its rights.

183.    Plaintiffs were stockholders of Citigroup at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Citigroup stockholders.

184.    The current Board of Citigroup consists of the following fourteen individuals: defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, Hennes, McQuade, and non-defendant Peter Blair Henry.

**A.  Demand Is Excused Because Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Spero, Turley, Hennes, and McQuade Face a Substantial Likelihood of Liability for Breach of Fiduciary Duty**

185.    A pre-suit demand on the Citigroup Board is excused because a majority of the Citigroup Board faces a substantial likelihood of liability for breach of faith and loyalty. Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Reiner, Turley, Hennes and McQuade (the "Current Director Defendants"), thirteen of the fourteen current directors, breached their duty of good faith and loyalty.  Despite knowing about substantial control deficiencies at BUSA and Banamex and the importance of Citigroup's operations in Mexico to its revenues, the Current Director Defendants failed to take action to fix the controls at Banamex and BUSA, including controls over legal compliance, risk management, financial reporting, and compliance with Citigroup's own policies.  Specifically, ███████

████████████████████████████████████████████████████████████

████████████████████  ██  ████████████████████████████  █████  ███

████████████████████████  ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████  The Current Director Defendants' failure to act in the face of this known duty to act is a breach of their duty of loyalty.

186.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  ██████████████████████████████████

█████████████████████

(a) ███████████████████████████████████
███████████████████████

(b) ███████████████████████████████████
███████████████████████████████████████
███

(c) ███████████████████████████████████
████████████████████████████████████

(d) ███████████████████████████████████
███████████████████████████████████████
██████████████████

(e) ███████████████████████████████████
████████████████████████████████████

(f) ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████

(g) ███████████████████████████████████
███████████████████████████████████████
█████████████████████████

(h) ████ ████ ████ █████ ██ ███ ████
██████████████████████

(i) ███████████████████████████████

████████████████████████████████████

█████████████████████████

(j) ███████████████████████████████

████████████████████████████████████

██████████████████████████

(k) ██ ███ ████ █ █████ ██████ ████ ████ █████

███████████████████████████████████

(l) ███████████████████████████████

████████████████

(m) ████████████████████████████

███ ██████████████████████████████

████████████████████████████████████

██████████████████████████

(n) ████████████████████████████

████████████████████████████████████

█████████████████████

(o) ████████████████████████████

████████████████████████████████████

██████████████████

(p) ██ ████ █ ██ █████ █████ ████ █████ █ ██

██████████████████

─────────────────────

█ ████████████████████

(q) ████ █████ ████ █████ █████ █████
████████████████████████████████████████
███████████████████████████

(r) ███████████████████████████████
████████████████

(s) ██ ███████ ███ ████ ██████ █████ ██ ████ █
███████████████████

(t) ███████████████████████████████
████████████████████████████████████████
█████████████████

(u) ███████████████████████████████
█████████████

(v) ███████████████████████████████
████████████████████████████████████████
████████████

(w) ███████████████████████████████
████████████████████████████████████████
██████

(x) ███████████████████████████████
███████████████████

(y) ███████████████████████████████
████████████████████████████████████████
██████████

(z) ██████████████████████████

████████████████████

(aa) ██████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████

(bb) ██████████████████████████

███████

(cc) ████████████

(dd) ████████████████

(ee) ██████████████████████████

█████

187. ███████████████████████

████████████████████████████████

████████████████████████  ████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████  ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████  ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████   ██████████████████████

███████████████████████████████████████████

██████████████████████████████   ███████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

188.    The Current Director Defendants' knowledge of all of the foregoing is also supported by the fact that the OCC and FRB Consent Orders required that the Board review and approve quarterly progress reports to the OCC and FRB.   Further, the FRB Consent Order explicitly delegated to the Board responsibility for oversight of all supervisory actions, including oversight of remediation of the Consent Orders.  The FRB Consent Order also required the Board take appropriate steps to utilize Citigroup's financial and managerial resources to ensure remediation of the Consent Orders and noncompliance with the BSA/AML.

189.    Despite that knowledge, the Current Director Defendants knowingly and in conscious disregard of their duty failed to act to correct the constant BSA/AML violations leading to fines and fraud loss at Banamex and BUSA.  The Current Director Defendants thereby

breached their fiduciary duty of loyalty and good faith.   Accordingly, the Current Director Defendants face a substantial likelihood of liability for such breach and demand upon them is futile

190.    In addition, defendants Santomero, Spero, O'Neill, and Turley were members of the Audit Committee at times during the wrongdoing complained of herein.   Under the Audit Committee's Charter, these defendants had a heightened duty to oversee "the performance of the internal audit function," the regulatory environment and trends, "Citigroup's disclosure controls and procedures," fraud and operating losses, "internal and external fraud incidents, and associated control enhancements and remediation plans," and ensure "compliance with legal and regulatory requirements" including BSA/AML. ███████████████████████████

████████████████████████████████████████████

██████████████████████     ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

191.    Despite that knowledge, Audit Committee Defendants Santomero, Spero, O'Neill, and Turley knowingly or in conscious disregard of their duty caused or allowed BSA/AML violations and fraud loss at Banamex and BUSA by failing to ensure Citigroup implemented and maintained internal controls at Banamex and BUSA, including those necessary to effectively prevent, detect, and report BSA/AML violations and protect against fraud loss, such as control over legal compliance, financial reporting, and risk management.   Audit Committee Defendants Santomero, Spero, O'Neill, and Turley thereby breached their fiduciary duty of loyalty and good

faith.  Accordingly, Audit Committee Defendants Santomero, Spero, O'Neill, and Turley face a substantial likelihood of liability for such breach and demand upon them is futile.

192. ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

193. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██ ██ █ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██

███████████████████████████████████████████████

██████████████████████████ ████████████████████

███████████████████████████████████████████████

██████████████████████████████████

194.    In addition, certain Risk Management and Finance Committee Defendants, specifically defendants Santomero, Thompson, Zedillo, Humer, Turley, and Hennes were members of the Risk Management and Finance Committee at times during the wrongdoing complained of herein.   Under the Risk Management and Finance Committee's Charter, these defendants had a heightened duty to oversee operational risk, risk assessment, risk management, and risk reporting to the Board.   ██████████████████████

██████████████████████████████████████████████

██████████████████████████

195.    Despite that knowledge, Risk Management and Finance Committee Defendants Santomero, Thompson, Zedillo, Humer, Turley, and Hennes knowingly or in conscious disregard of their duty caused or allowed BSA/AML violations and fraud loss at Banamex and BUSA by failing to ensure Citigroup implemented and maintained internal controls at Banamex and BUSA, including those necessary to effectively prevent, detect, and report BSA/AML violations and protect against fraud loss, such controls over legal compliance, financial reporting, and risk management.  Risk Management and Finance Defendants Santomero, Thompson, Zedillo, Humer, Turley, and Hennes thereby breached their fiduciary duty of loyalty and good faith.  Accordingly, Risk Management and Finance Defendants Santomero, Thompson, Zedillo, Humer, Turley, and Hennes face a substantial likelihood of liability for such breach and demand upon them is futile.

**B.      Demand Is Futile Because a Majority of Citigroup's Board Faces a Substantial Likelihood of Liability for Violating Section 14(a) of the Exchange Act**

196.    As alleged above, Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes violated section 14(a) of the Exchange Act by (at least negligently) making false and misleading statements in the March 2013-2015 Proxies.  Accordingly, Director Defendants Corbat, O'Neill,

Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes face a substantial likelihood of liability.

## IX.    COUNTS

### A.    COUNT I – Against Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes for Violation of Section 14(a) of the Exchange Act

197.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

198.    Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders which were contained in the March 2013-2015 Proxies.  The proxies contained proposals to Citigroup's stockholders that they vote to approve the 2013-2015 plans and re-elect the members of the Board.  The proxies, however, misrepresented and failed to disclose that the Individual Defendants knew that BUSA's and Banamex's internal controls were deficient but failed to take necessary action.  By reasons of the conduct alleged herein, Director Defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes violated section 14(a) of the Exchange Act.  As a direct and proximate result of these Director Defendants' wrongful conduct, Citigroup misled and/or deceived its stockholders by making false and misleading statements that were an essential link in stockholders heeding Citigroup's recommendation to elect the Director Defendants and by falsely portraying how the 2013-2015 plans would be administrated.

199.    The false and misleading information contained in the March 2013-2015 Proxies was material to Citigroup's stockholders in determining whether or not to elect the Director

Defendants or to approve the 2013-2015 plans. This information was also material to the integrity of the directors that were proposed for election to the Board.

200.    Plaintiffs, on behalf of Citigroup, thereby seek relief for damages inflicted upon the Company in connection with the improper approval of the 2013-2015 plans and election of the Director Defendants based upon the false and misleading March 2013-2015 Proxies. Plaintiffs, on behalf of Citigroup, also seek a disgorgement of the compensation paid to the Individual Defendants in connection with the 2013-2015 plans and to void the election of the directors proposed in the March 2013-2015 Proxies that contained false and misleading statements.

**B.     COUNT II – Against the Individual Defendants for Breach of Fiduciary Duty**

201.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

202.    As alleged herein, the Individual Defendants, by reason of their positions as officers and directors of Citigroup and because of their ability to control the business and corporate affairs of Citigroup, owed to Citigroup fiduciary obligations of due care and loyalty and were and are required to use their utmost ability to control and manage Citigroup in a fair, just, honest, lawful, and equitable manner. These duties include an obligation of which the Individual Defendants were fully aware, to manage Citigroup's business and affairs in accordance with all laws applicable to Citigroup's operations, including anti-money laundering law and regulation.

203.    The Officer Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly failing to implement and maintain an adequate system of internal controls at Banamex and BUSA. Specifically, the Officer Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate the BSA/AML, as well as other applicable law, and allowing the Company to suffer needless fraud

loss, by failing to implement and maintain an adequate system of internal controls at Banamex and BUSA.

204.    The Director Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly failing to implement and maintain an adequate system of internal controls at Banamex and BUSA.  Specifically, the Director Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate the BSA/AML and BSA/AMLL, as well as other applicable law, and allowing the Company to suffer needless fraud loss, by failing to implement and maintain an adequate system of internal controls at Banamex and BUSA.

205.    The Audit Committee Defendants, Compliance Committee Defendants, Risk Management and Finance Committee Defendants, Nomination, Governance and Public Affairs Committee Defendants, and the Ethics and Culture Committee Defendants breached their duty of loyalty and failed to fulfill their obligations under their respective committee's Charter by purposefully, knowingly, or recklessly failing to implement and maintain an adequate system of internal controls at Banamex and BUSA.  Specifically, these Committee Defendants breached their duty of loyalty by purposefully, knowingly, or recklessly causing or allowing the Company to violate the BSA/AML and BSA/AMLL, as well as other applicable law, and allowing the Company to suffer needless fraud loss, by failing to implement and maintain an adequate system of internal controls at Banamex and BUSA.

206.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Citigroup has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

207.    Plaintiffs, on behalf of Citigroup, have no adequate remedy at law.

C.   **COUNT III – Against the Individual Defendants for Waste of Corporate Assets**

208.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

209.   The wrongful conduct alleged included the failure to implement and maintain adequate internal controls to detect and prevent the illicit inadequate system of internal controls at Banamex and BUSA, as well as fraud loss and violations of law, including BSA/AML, resulting therefrom.  Any temporary benefits that Citigroup may have obtained through those violations of law have been eclipsed by the damages arising from the Individual Defendants' failure to cause Citigroup to implement internal controls to ensure compliance with applicable law, including BSA/AML. Further, the Individual Defendants caused Citigroup to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

210.   The wrongful conduct was continuous, connected, and on-going throughout the applicable time period. It resulted in continuous, connected, and on-going financial and reputable harm to the Company.

211.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

212.   Plaintiffs, on behalf of Citigroup, have no adequate remedy at law.

D.   **COUNT IV – Against the Individual Defendants for Unjust Enrichment**

213.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

214.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Citigroup.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Citigroup.

215.     Plaintiffs, as stockholders and representatives of Citigroup, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

216.     Plaintiffs, on behalf of Citigroup, have no adequate remedy at law.

## X.     PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Citigroup, demand judgment as follows:

A.     Against defendants Corbat, O'Neill, Rodin, Santomero, Thompson, Taylor, Zedillo, Humer, Spero, Ryan, Joss, Reiner, Turley, and Hennes and in favor of the Company for disgorgement of the compensation paid to the Individual Defendants in connection with the 2013-2015 plans and to void the election of the directors proposed in the March 2013-2015 Proxies;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Directing Citigroup to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Citigroup and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.     a proposal to strengthen the Company's controls over its operations involving Mexico;

2.      a proposal to strengthen the Company's controls over IAs of its subsidiaries, including Banamex;

3.      a proposal to strengthen the legal and regulatory compliance controls, including BSA/AML controls, at the Company's subsidiaries, including Banamex;

4.      a proposal to strengthen the risk management and fraud prevention controls at the Company's subsidiaries, including Banamex;

5.      a proposal to strengthen the financial reporting controls at the Company's subsidiaries, including Banamex;

6.      a proposal to strengthen the Company's controls over its subsidiaries, including Banamex, particularly controls related to legal compliance, risk management, and financial reporting;

7.      a proposal to effectuate a Compliance Committee Charter for Citigroup and to designate at least three directors to sit on that committee;

8.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

9.      a provision to permit the stockholders of Citigroup to nominate at least three candidates for election to the Board;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Citigroup have an effective remedy;

E.      Awarding to Citigroup restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## XI.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable by jury.

Dated: September 21, 2015

LAW OFFICE OF THOMAS G. AMON
THOMAS G. AMON
PETER B. PATTERSON, JR.

_____
THOMAS G. AMON

156 West 56th Street, Suite 1102
New York, NY 10019
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
tamon@amonlaw.com
ppatterson@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
gstassi@robbinsarroyo.com

Attorneys for Plaintiffs

1040934

-121-

## VERIFICATION

I, Esther Kogus, hereby declare as follows:

I, Esther Kogus, am a plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _09 - 10 - 2015_

_Esther Kogus_
ESTHER KOGUS

1053897

## VERIFICATION

I, John Brewer, hereby declare as follows:

I am the Executive Director of Fireman's Retirement System of St. Louis, plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____ 9/14/15 _____

_____
JOHN BREWER

1053894